# In re Lou R. Vitale

[563 A.2d 613]

No. 87-312

Present: **Allen, C.J., Peck, Gibson and Dooley, JJ., and Costello, D.J. (Ret.), Specially Assigned**

Opinion Filed April 21, 1989

Motion for Reargument Denied May 26, 1989

*Robert P. McClallen* and *Arthur A. Mitiguy, Law Offices of Robert P. McClallen*, Rutland, for Petitioner-Appellant.

*Jeffrey L. Amestoy, Attorney General,* and *John H. Hasen, Assistant Attorney General*, Montpelier, for Amicus Curiae State.

**Gibson, J.** Petitioner appeals a decision of the Environmental Board (Board) determining that petitioner was subject to Act 250 jurisdiction in the development of his commercial enterprise. We affirm.

## I.

The facts are not in dispute. On February 10, 1985, petitioner entered into an agreement to purchase 1.57 acres of land in Rutland Town for use as a site for his concrete step manufacturing business. Petitioner agreed to pay $7,500 for the land, and a closing date was set. On the advice of petitioner's counsel, petitioner

and the sellers agreed to delay the closing so that the property could be subdivided into two separate lots, consisting of a .99-acre parcel and a .58-acre parcel. The property was subdivided in this manner in order to avoid Act 250 jurisdiction. Petitioner assisted the sellers in obtaining the permits necessary to effectuate the subdivision.

Closing on the property occurred on November 1, 1985, at which time the seller (one of the two owners had died in the interim) presented petitioner with deeds to both the .99-acre parcel and the .58-acre parcel. On the advice of counsel, petitioner refused to accept the deed to the .58-acre parcel. In accepting the deed to the .99-acre parcel, however, petitioner paid the full purchase price originally agreed upon by the parties for the entire 1.57-acre parcel. The subdivision left the seller with what petitioner's counsel conceded was a "useless" .58 acre parcel, which was virtually landlocked with "infeasible" access from the main road.

By November 17, 1985, petitioner completed construction on the .99-acre parcel of all the improvements necessary for the operation of his business. On November 26, 1985, the seller conveyed the remaining .58-acre parcel to petitioner. In addition to consideration of "one or more dollars," petitioner paid the seller's attorney's fees relative to this conveyance. Petitioner denies that this second transfer was related to the first conveyance for purposes of Act 250 jurisdiction. He admits, however, that he wanted to obtain ownership of the remaining .58-acre parcel because he believed that he had already paid for it and might as well have ownership of it.

Subsequently, the District Coordinator for the local Environmental Commission determined that petitioner's development was subject to Act 250 review. An advisory opinion from the Executive Officer of the Environmental Board affirmed the District Coordinator's decision. Both decisions were based on an erroneous finding that both parcels were involved in petitioner's project because there had been a clearing of vegetation on the .58-acre parcel which constituted a construction of improvements in connection with the project. Petitioner then requested a declaratory ruling from the Board.

The Board rejected the analysis applied by the District Coordinator and the Executive Officer, finding that the clearing of the .58-acre parcel had been undertaken by Central Vermont Public

Service Corporation and New England Telephone Company, and was not done at the instigation of petitioner. Nevertheless, the Board ruled on separate grounds that Act 250 jurisdiction was applicable to petitioner's project. The Board defined the issue as whether petitioner had commenced construction of a "development" within the meaning of 10 V.S.A. § 6001(3),[1] thus requiring an Act 250 permit under 10 V.S.A. § 6081.[2] The Board interpreted § 6001(3)'s definition of "development" in light of Board Rule 2(A)(2)[3] and concluded that petitioner had exercised "control" over the full 1.57 acres at the time the project was built. The Board ruled that Act 250 therefore applied to the project.

## II.

■ The crux of this appeal lies in the Board's construction of the term "controlled," as contained in Board Rule 2(A)(2).[4] In reviewing the Board's interpretations of Act 250, we are required to afford those interpretations a high level of deference. See *Committee to Save the Bishop's House, Inc.* v. *Medical Center Hosp. of Vt., Inc.*, 137 Vt. 142, 150-51, 400 A.2d 1015, 1019-20 (1979) (the " 'construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong' ") (quoting *Red Lion Broadcasting Co.* v. *Federal Communications Comm'n*, 395 U.S. 367, 381 (1969)). In applying this deferential level of review, we have upheld a number of

---

[1] 10 V.S.A. § 6001(3) defines "development" as, among other things "the construction of improvements for commercial or industrial purposes on more than one acre of land within a municipality which has not adopted permanent zoning and subdivision bylaws." The Town of Rutland had not adopted permanent zoning bylaws at the time of the Board's decision.

[2] 10 V.S.A. § 6081(a) provides that "[n]o person shall . . . commence construction on a . . . development . . . without a permit."

[3] Board Rule 2(A)(2) provides that:
   (A) A project is a "development" if it satisfies any of the following definitions:
   . . . .
   (2) The construction of the improvements for any commercial or industrial purpose, including commercial dwellings, which is located on a tract or tracts of land of more than one acre *owned or controlled* by a person . . . . In determining the amount of land, the area of the entire tract or tracts of involved land *owned or controlled* by a person will be used. (Emplasis added.)

[4] Petitioner does not challenge the validity of Rule 2(A)(2) itself, but rather attacks the Board's definition and construction of the term "controlled" pursuant to the Rule.

Board interpretations of Act 250 and of its own rules. See, e.g., *In re Spear Street Assoc.*, 145 Vt. 496, 500-01, 494 A.2d 138, 141-42 (1985) (deferring to Board's interpretation of Act 250 regarding procedure required in determining when permit will issue); *In re Orzel*, 145 Vt. 355, 361, 491 A.2d 1013, 1016 (1985) (no error in Board's definition of "substantial change" contained in Board Rule 2(G)).

This deferential level of review, however, does not equate with mere judicial passivity in determining the propriety of Board "interpretations" of its own rules. See *In re Agency of Administration,* 141 Vt. 68, 80, 444 A.2d 1349, 1354 (1982) (reversing Board's interpretation of terms "plan" and "construction of improvements" where the demolition of a building was not tied to any plan for construction). We are guided, as always, in our construction of legislative schemes by our attempt to discern the legislative intent, as evidenced by the plain meaning of the statute. See *In re Spear Street Assoc.*, 145 Vt. at 499, 494 A.2d at 140. An attempt to discern the meaning of the word "controlled" through an examination of the statutory history of Act 250 is of limited value, however, primarily because the term comes from a Board rule and is not a direct derivative of the statute itself. The term "controlled" is not defined in either the statute or the Board's rules.

In the first instance, the meaning of the word "controlled" as used by the Board is a question of fact for determination by the Board. Other courts, in unrelated areas of the law, have also treated the issue of control as a question of fact. See, e.g., *Alleghany Corp.* v. *Breswick & Co.*, 353 U.S. 151, 163 (1957) (railroad company exerted de facto control over other railroad company despite owning only 10% of other company's stock); *Rochester Tel. Corp.* v. *United States,* 307 U.S. 125, 145 (1939) (by assigning Federal Communications Commission the duty of "ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case."); *Public Serv. Co. of N.M.* v. *Federal Energy Regulatory Comm'n,* 628 F.2d 1267, 1269 (10th Cir. 1980) (control is a question of fact; no basis for finding of control despite evidence of 50% ownership in company in question). The manner in which the Board used this term in the instant case must be upheld on appeal, absent com-

pelling indications of error. See *Committee to Save the Bishop's House,* 137 Vt. at 151, 400 A.2d at 1019-20.

This approach is not an invitation for an arbitrary expansion of its jurisdiction by the Board. See *In re Agency of Administration,* 141 Vt. at 76, 444 A.2d at 1352. The statute carefully defines what may be covered by the term "development" for purposes of Act 250 jurisdiction, and certain activities are specifically excepted from this definition. See 10 V.S.A. § 6001(3). Also, it is a well-established rule in this state that in construing land use regulations any uncertainty must be decided in favor of the property owner. See *Murphy Motor Sales, Inc.* v. *First Nat'l Bank,* 122 Vt. 121, 123-24, 165 A.2d 341, 343 (1960). The Board is thus limited to determining in a factual context whether petitioner has "control" over the property in question. If petitioner is legally barred form exercising "control" over the property, the Board may not avoid a searching judicial review of its decision by labeling its determination a finding of fact. See *In re Agency of Administration,* 141 Vt. at 75, 444 A.2d at 1352; see generally *Lorain Journal Co.* v. *Federal Communications Comm'n,* 351 F.2d 824, 829 (D.C. Cir. 1965) (distinguishing actual control from legal control). Finally, this Court will reverse even findings of fact by the Board when such findings are clearly erroneous. *In re Spear Street Assoc.,* 145 Vt. at 499, 494 A.2d at 140. Thus, numerous safeguards are present to protect against arbitrary actions on the part of the Board.

The primary rule when reviewing construction of an administrative rule is to give language its plain, ordinary meaning. *In re Hydro Energies Corp.,* 147 Vt. 570, 573, 522 A.2d 240, 242 (1987). The dictionary defines the term "control" as: "To exercise restraining or directing influence over. To regulate; restrain; dominate; curb; to hold from action; overpower; counteract; govern." Black's Law Dictionary 298 (5th ed. 1979); see also Webster's New Collegiate Dictionary 245 (1981) ("control: . . . to exercise restraining or directing influence over").

■ The Board concluded that due to the impossibility of direct access to the property, the "extremely" short length of time between the sales of the two lots, and the lack of marketability of the property to any buyer other than petitioner, the acquisition of the two parcels by petitioner was all part of the same transaction and that petitioner "controlled" both lots for purposes of Act 250 jurisdiction. The Board also noted that petitioner suggested the subdivision, carried out the survey, and obtained the necessary

permits, that no provision was made to retain a right of way for the seller across the .99-acre lot that was being sold, and no additional consideration was paid by petitioner for the .58-acre lot when he acquired legal title. The Board specifically rejected petitioner's argument that these were separate arm's-length transactions. For all practical purposes, petitioner controlled the .58-acre lot, although legal title remained in the seller. The Board's findings, which are not contested by petitioner, are not clearly erroneous, and there are no compelling indications that the Board was wrong in concluding that petitioner "controlled" the full 1.57 acres at the time of construction of the improvements. The Board's decision does not thus warrant reversal by this Court on appeal.[5]

*Affirmed.*

**Peck, J.,** dissenting. In this matter the zeal of the Environmental Board outran its authority. Such overreaching on the part of the Board is understandable even if it should not be condoned. It is, after all, one of the Board's primary duties to protect our natural environment against the cupidity of the would-be spoilers who descend upon the land, generally in the name of what is, somewhat ironically, called "development," and often coming from beyond our borders, like the invasion of the South by the post-Civil War carpetbaggers. It is a serious and a heavy responsibility that the Legislature has placed on this public body; it is clear that its members take their task seriously.

Nevertheless, the powers of the Board, like those of all state boards and commissions, particularly those having a quasi-judicial function, are limited strictly to those granted by the Legislature. *In re Agency of Administration,* 141 Vt. 68, 75, 444 A.2d 1349, 1352 (1982); *Miner v. Chater,* 137 Vt. 330, 333, 403 A.2d 274, 276 (1979); *New Hampshire-Vermont Physician Service v. Commissioner, Dept. of Banking & Ins.,* 132 Vt. 592, 596, 326

---

[5] This approach comports with the broad interpretations of this term given by this Court in other contexts. See, e.g., *State v. Godfrey,* 137 Vt. 159, 161, 400 A.2d 1026, 1026-27 (1979) (in interpreting drunk driving statute, Court concluded that "[t]he element of actual physical control is present, whether or not the defendant is in a position to effectively exercise it" due to his unconsciousness); *In re Cadieux,* 129 Vt. 624, 626, 285 A.2d 738, 740 (1971) (workers were under defendant's "control and direction" because they were dependent upon defendant for payment of their wages).

A.2d 163, 166 (1974). *Nothing* is presumed in favor of their jurisdiction. *Gloss* v. *Delaware & Hudson R.R.*, 135 Vt. 419, 422, 378 A.2d 507, 509 (1977). Whenever governmental officials and agencies undertake to define their own limits and, doing so, exercise powers they do not have, they become zealots as a practical matter in the most egregious sense of that term, regardless of their good intentions. Frustration based on a lack of jurisdiction in an anomalous situation does not justify an improper, unilateral extension of power beyond the limits of the legislative grant in order to justify a decision in such a case. But that is precisely what the Board has done here.

The Environmental Board is one which calls for close scrutiny by this Court. Its statutory powers constitute a dramatic impingement on property rights as they existed under the common law. See 1 V.S.A. § 271 (common law adopted as "laws in this state"); *State* v. *Brown*, 147 Vt. 324, 327, 515 A.2d 1059, 1061 (1986) ("A statute does not change common law by doubtful implication; it is only overturned by clear and unambiguous language."). Moreover, on at least two occasions this Court struck down rules promulgated by the Board as overboard or exceeding the Board's statutory authority. *In re Agency of Administration*, 141 Vt. at 92-93, 444 A.2d at 1361; *Committee To Save the Bishop's House, Inc.* v. *Medical Center Hospital of Vermont, Inc.*, 137 Vt. 142, 151, 400 A.2d 1015, 1020 (1979).

The Board's "track record," coupled with the fact that the relevant statutes are in derogation of the common law, suggests that this Court should be alert and exacting in abiding by and enforcing its own ruling set forth in *Agency of Administration*, 141 Vt. at 75, 444 A.2d at 1352 (emphasis added):

> An agency [of government] must operate . . . within the bounds authorized by its enabling legislation, or this Court will intervene. *Where it exercises its adjudicative function we will be especially vigilant,* since proper utilization of the judicial process is unrelated to expertise in any particular subject matter.

It is one thing for the Board to test the limits of its authority and act as it did in this matter. It is quite another, however, for this Court — which has a duty to act with strict neutrality and in accordance with the laws enacted by the Legislature, to exercise judicial restraint, and to reject the alluring temptation to twist

those laws out of shape — to abuse statutory construction in order to support a predetermined and desired result.

An administrative agency is often so close to the general subject matter of its concerns that, in its enthusiastic diligence, it fails to see the forest for the trees. The majority of this Court cannot, in conscience, plead any such excuse to mitigate its participation in the ultimate disposition of this controversy. We have an obligation to police quasi-judicial administrative bodies by keeping them from a usurpation of power and strictly within the limits of the powers granted to them. As noted above, *nothing* will be presumed in favor of their jurisdiction. *Gloss,* 135 Vt. at 422, 378 A.2d at 509. Instead the majority has become, in practical effect, a co-conspirator with the Board in an excess of power in order to deprive petitioner of his rights by literally making the law say what it does not.

The key word in the majority opinion is "control" (of the .58 acre parcel). The opinion points out that, under the special circumstances of a given case, some courts have expanded the plain commonly understood meaning of the word and stretched it beyond formal "legal" control to include "actual" control. In other words, apparently, "control" may be de facto although it may not be de jure.

Several cases from other jurisdictions are cited by the majority in support of the legal-actual distinction. These citations coat the opinion with a false patina of validity. When the surface gloss is scraped away, they are exposed as not in point. In each case the prospective transferee was permitted to exercise various degrees of *active* control of the subject prior to the subsequent legal transfer. No such active control of the .58 acre parcel by the petitioner occurred here.

Thus, for example, in *Lorain Journal Co.* v. *Federal Communications Commission,* 351 F.2d 824 (D.C. Cir. 1965), involving an application for transfer of control of a television station, the court noted that after the first six months of the attempted transfer:

> [The would-be transferor] gave the station only half his time, for about five months, less [than that] thereafter, and no time whatever by May 1960. . . . [Transferor] acted like a man who had relinquished control . . . while [transferee's] attitude was that of a proprietor steadfastly attending to business.

*Id.* at 828.

There was no evidence whatever of any similar active control by petitioner of the .58 acre parcel here until the *legal* title actually passed to him. There is no evidence or any claim that the grantor could not have sold the parcel with impunity to anyone other than petitioner between November 1, 1985, when title to the .99 acre parcel changed hands, and November 26 of the same year when the .58 acre parcel was also sold to petitioner.

The evidence disclosed that the entire property had been subdivided into the two parcels (.99 acre and .58 acre) prior to the sale of either; that separate deeds were tendered to petitioner on November 1st, but petitioner refused to accept the deed to the .58 acre parcel at that time. It is not questioned by anyone that neither legal title nor *legal* control to the smaller parcel rested in him between November 1 and November 26th.

The evidence does suggest, I willingly concede, that by November 1 there may have been an unwritten agreement between the grantor and petitioner to transfer the .58 acre parcel to petitioner at a later date. This is wholly irrelevant, however, since under the Statute of Frauds (12 V.S.A. § 181(5)) agreements relating to real property are not binding unless reduced to writing and signed by the party to be charged.

For purposes of this case, then, even under the authorities cited by the majority, the result should, in justice and fairness to the petitioner under the statutes (strictly construed, since they are in derogation of the common law and control the jurisdiction of the Board), be determined by the evidence relating to the activities of the petitioner between November 1, 1985 and November 26, 1985 in relation to the .58 acre parcel. The authorities are clear that if we are to accept the theory of *actual* control some degree at least of *active* control is a prerequisite. There is no evidence whatsoever of any such activity by the petitioner vis-a-vis the seller or the smaller parcel itself; he was as completely passive as any other adjoining property owner.

The majority recites a litany of circumstances which it offers as a validation of the Board's action; or, in other words, a *quod erat demonstrandum,* and there it stops; the list does not point to a single instance of *active* control. In fact, the recitation constitutes a series of irrelevancies. When considered dispassionately they point up the primary weakness of the opinion: an inability, or at least a refusal, to undertake a complete and honest judicious

analysis, free of preconceptions, and free of a preliminary bias in favor of a desired result.

Analyzed without prejudice, the facts and circumstances relied on by the majority support only one thing: there may have been an agreement between the seller and the petitioner-buyer to divide a larger parcel of land into two smaller parcels and effect the transfer of title in two separate transactions at different times.

This decision may indeed have been motivated by the petitioner's desire to *avoid* Board jurisdiction under Act 250. Nevertheless, the implication that this conduct borders on pure subterfuge or chicanery is unworthy of this Court; it reflects unjustly on the integrity of the petitioner as well as the attorneys who advised him. There was nothing whatever illegal or dishonest; it resulted from a studied and correct analysis of the controlling statutes following a more careful analysis than that attempted by the majority.

It is a truism that it is entirely proper, legally as well as morally, to "avoid" a law but not to "evade" it. The practical — and legal — application of this truism allows all of us, as a matter of right, and in any field controlled generally by legislative enactments, to take advantage of a circumstance, however narrow and obscure it may be, that is not, in law and fact, covered by the enactments. This is true regardless of a close relationship between what is and what is not controlled by the legislation. These openings may be intended by the Legislature, or they may be inadvertent. However, if the opening *does* exist, it is an egregious abuse of judicial power for a court or quasi-judicial body, in its creative arrogance, to seal off a citizen's right to take advantage of it. It is the exclusive prerogative of the Legislature under Chapter II, § 5 of our State Constitution (separation of powers), to address the issue, and to change or modify it through the amendatory process if it sees fit to do so.

Not one of the several items contained in the alarmist and condemnatory rhetoric of the majority can mask its violation of the separation of powers. It has engaged once more in judicial legislation, amending the statutes from the bench to say more than they do.

It is appropriate to examine the merits of some of the items found by the Board and accepted by the majority in support of an affirmance. I submit the majority has simply been overwhelmed and blinded by numbers. These so-called facts have no validity as

support for the result. They do not demonstrate any actual control.

The Board and the majority opinion cite "the impossibility of direct access to the [.58 acre parcel]" as significant to the question of control. In fact, however, although access from the main road, without a right of way over other lands, would be difficult, it was *not* impossible. Moreover, it is absurd to conclude that a grantee "controls" a remainder by virtue of the mere fact that the grantor, in conveying away part of his land, has cut off access to the remainder. A later right of way from the grantee or other adjoining owners is always possible; a later sale to an adjoining owner, including the grantee, is equally possible. I have never heard it suggested, before today, that any adjoining owner "controlled" a remainder because of access problems whether access is literally impossible or merely difficult, without some evidence of active control during the interim.

Moreover, it is always possible that such a remainder parcel, because of its size or its terrain, has no practical use, standing alone. Continued ownership, with its tax liability and other responsibilities, may be more of a nuisance, if not a burden, to the owner than it is worth to him, so that he is willing to dispose of it to one of the adjoining owners for little or nothing.

The majority also accepts without question or analysis that the short period of time between the sales of the two lots was a further indication of control by petitioner. But time is a relative word in the context of this case. It might have been much longer, months or years, and still be part of a project planned by a developer. Nevertheless, as a part of petitioner's "project" in this case, the separated .58 parcel is not only irrelevant, but admittedly it constituted no part of the project. Quoting the majority:

> By November 17, 1985, petitioner completed construction on the .99-acre parcel of all the improvements necessary for the operation of his business.

Therefore, the ultimate issue, as even the majority recognizes, is control of the smaller piece of land between November 1, 1985 and the 26th of the same month and year, when the second parcel was conveyed to petitioner.

Thus far there is nothing to demonstrate control, to say nothing of the *active* or *actual* control, required by the authorities relied on by the majority itself. I suggest, further, that the evi-

dence is to the contrary. Petitioner refused a deed to the second parcel in the first instance; the grantors did not want that parcel, apparently because of a probable marketability problem.

The remainder parcel was of no benefit to petitioner's project. He took it to relieve the grantor of what both considered a relatively useless piece of real estate. The common sense of the transaction is that the grantor insisted on disposing of all or none. But once more, these considerations have no relation to control (of any kind) during the crucial period. The fact that the smaller parcel was not involved in petitioner's project is conclusive to any fair-minded analysis: the second transfer had no relation to the first, for purposes of Act 250 jurisdiction, when as it appears, there was no active or actual (call it what you will) control during the 26-day interim period. The second parcel was neither owned nor controlled by petitioner during that period. As I have noted earlier, the evidence, at its best, could be interpreted to support nothing more than a possible agreement that the second parcel would ultimately be transferred to petitioner. But that did not occur until after the fact of the completion of the project on the larger parcel.

Finally, the payment of the seller's attorney's fees by petitioner, and the failure to retain a right of way to land that had little value, are equally irrelevant to a showing of the slightest measure of any active control on petitioner's part.

Notwithstanding the recitation of various rules of construction by the majority, most notably that "in construing land use regulations any uncertainty *must* be decided in favor of the property owner," the opinion does an abrupt *volte face* and affirms the Board. The clear fact is that the latter's usurpation of authority, and it is just that, is *not* supported by the record. At the very least, from petitioner's point of view, which is manifestly correct, an uncertainty exists.

I am reminded by today's affirmance of the fable involving a mother sparrow who built her nest under the eaves of a court of justice. One day, while she was away seeking food for her young, who could not yet fly, a serpent gliding onto the scene ate them up. Upon her return and discovery of her loss, the mother bird began a pathetic wailing. "It is not only my little ones that I mourn," she cried, "but that I should be wronged in the very place where the injured fly for justice."

Judged by the majority's own adopted standards of requiring some active control, the rules relating to statutes in derogation of the common law, and the strict scrutiny of administrative quasi-judicial decisions, petitioner has been denied justice in the very place to which he came for justice; while a usurpation of authority by the Board has been affirmed. There is, I suspect, a lack of sympathy for the petitioner involved in this case, which has, I am convinced, influenced the majority against him.