## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 151-11-17 Vtec |

Snowstone, LLC Act 250 Jurisdictional
Opinion Appeal (#2-308)

### Merits Decision on Initial Bifurcated Issues

Jason Snow, working through his limited liability company, Snowstone, LLC ("Snowstone") is a stone mason, excavator and contractor, living and working in the Central Vermont towns of Springfield, Chester, and surrounding communities. When Mr. Snow was anticipating the exhaustion of his supply of dimensional stone from his existing small quarry, he was told of another small stone quarry, now dormant, that may have quality dimensional stone. The owners of the large parcel of land on which this small quarry was located—Justin and Maureen Savage—approached Mr. Snow to determine his interest in purchasing the portion of their land upon which the stone quarry was located. The parties then agreed to investigate how Mr. Snow may be permitted to excavate the stone on the Savages' property.

Mr. Snow and Mr. Savage determined that the stone could be excavated using only a 0.64-acre portion of the Savages' property. Because the stone was located some distance within the Savages' property, the parties determined that Mr. Snow would also need an access easement over the Savages' land. It was later determined that a sixteen-foot wide access easement to the stone quarry would only cover an additional 0.29 acres of the Savages' land, meaning that access to the quarry and the area needed to extract the stone would cover only a 0.93-acre portion of the Savages' land. The parties thereafter contracted for the Savages to sell the stone extraction site and access easement to Snowstone.

With this information in hand, Mr. Snow sought a jurisdictional opinion from the District #2 Environmental Commission Coordinator ("District Coordinator") to determine whether the proposed extraction of dimensional stone from the Savages' property would be

subject to Act 250 jurisdiction. The District Coordinator responded with his opinion (JO #2-308), concluding that the Savages' sale of a 0.93-acre portion of their land to Snowstone was not an arm's length transaction, and that therefore Act 250 jurisdiction would attach to the entire Savage parcel, if the dimensional stone extraction project was pursued as documented in the parties' purchase and sale agreement. Snowstone thereafter appealed the District Coordinator's determination to this Court.

Snowstone is represented in this appeal by its attorneys, Lawrence G. Slason, Esq. and Samantha Snow, Esq.

The following area residents have concerns about the proposed project and therefore entered their appearance as Interested Persons; they have been assisted in this appeal by their attorney, Merrill E. Bent, Esq.: Bruce and Linda Watson, Izzet and Sandy Haci, Kim and James Bergeron, Ellen and Edward Beatty, Kern Svetlana Phillips, Paul Hogan, Maryellen and James Wichelhaus, Teresa Harrington, Judy and Dan Massey, Joe Calzone, Marcia Packlick, and Jack Munson. These Interested Persons are hereinafter referred to as "the Neighbors."

Windsor County Properties, LLC, an owner of another area property, also appeared as an Interested Person and is assisted by its attorney, Barry J. Polidor, Esq.

The Natural Resources Board has also filed an appearance in this matter and is represented by its attorney, Greg Boulbol, Esq.

Snowstone, the only party to file an appeal in this matter, filed a Statement of Questions listing the following legal issues:

1. Does the proposed stone quarry constitute "*development*" for a commercial purpose on more than one acre of land in Cavendish, Vermont, for the purpose of determining Act 250 jurisdiction?

2. Is the entire tract considered to be owned by a single "*person*" for the purpose of determining Act 250 jurisdiction?

Appellant Snowstone's Statement of Questions, filed December 6, 2017, at 1.

As the parties completed the discovery process and prepared for a de novo hearing, the Court encouraged them to investigate a voluntary resolution of their disputes. When those efforts were unsuccessful, and the parties had advised the Court that they had completed the

discovery process, the Court set the matter for trial. Prior to the trial, the Court conducted a site visit with the parties on May 11, 2018.

The trial was scheduled to be conducted over two days, May 17 and 18, 2018, at the Vermont Superior Courthouse in Newfane, Vermont. However, after Snowstone had completed the presentation of its case in chief on May 17, 2018, Snowstone proposed, and the Neighbors agreed, that the Court should first address two of the legal issues presented in the appeal, since the manner in which the Court addressed those initial legal issues would determine how, and whether, legal issues which the Neighbors intended to present could be presented in any remainder of the trial.[1]

Based upon the parties' representations, and upon its own understanding of the issues presented, the Court issued an Interim Order in which it established deadlines for the parties to file post-hearing legal memoranda. See In re Snowstone, LLC Act 250 JO Appeal, No. 151-11-17 Vtec (Vt. Super Ct. Envtl Div. June 14, 2018) (Durkin, J.). Of particular note in the Court's Interim Order is that at the close of Snowstone's case in chief, the Neighbors "represented that they did not have testimony or other evidence to contradict Snowstone's evidence concerning the revised Purchase and Sale agreement and the assertion that the proposed sale would be an 'arm's length' transaction." Id. at 3.

In its Interim Order, the Court advised that "it would first determine whether the Savage-Snowstone transaction is an 'arm's-length' transaction and whether the Sellers retain sufficient ownership and control of the Snowstone parcel, such that the Sellers and Snowstone should be considered a single 'person' for purposes of Act 250 jurisdiction." Id. at 3–4.

The Court also established a schedule for Snowstone to submit any necessary stormwater and discharge permit applications with the Vermont Agency of Natural Resources and its subdivisions. Once a determination has been made on Snowstone's applications for any necessary stormwater and discharge permits, or a determination that no such permits are required for this project by applicable law and regulations, any party to this appeal may:

> [R]equest that the Court conduct a further hearing on whether any stormwater permit determination has a relevancy to the legal issue of whether all activities

---

[1] Windsor County Properties, LLC joined the Neighbors in consenting to Snowstone's proposal of a bifurcation of the legal issues in this appeal.

necessary for the operation of the proposed quarry can occur within the 0.93±
acres that Snowstone proposes to purchase. In the event that such a request is
made, the Court will schedule a further hearing.

Id. at 5, ¶8. The Court would then render a final decision and judgment order. Id.

"If no party requests a further hearing, the Court advised that it would then issue a judgment order, without further hearing, based upon the determinations rendered in this Merits Decision on Initial Bifurcated Issues." Id. at 6, ¶9.

With this somewhat unique procedural process in mind, we now turn to an adjudication of the initial factual and legal issues before us.

### Findings of Fact

Based upon the credible evidence presented in this first phase of our proceedings in this jurisdictional opinion appeal, including the evidence that was put into context by the site visit that the Court conducted with the parties, we hereby render the following findings of fact.

### The Savage Property and its Surrounding Neighborhood

1. Mr. and Mrs. Savage own a 176-acre parcel of undeveloped property located at the northwestern end of Tierney Road in Cavendish, Vermont. Their property is located in a very rural portion of the mostly rural Town of Cavendish. Route 131 dissects Cavendish east to west; Tierney Road lies north of Route 131, off of an elongated loop road known as High Street that intersects with Route 131 at the northeastern and southwestern termini of High Street.

2. Tierney Road is a dirt road that is sparsely populated. Within approximately a half mile from the Savages' property, the western side of Tierney Road is developed with larger single-family homes on larger lots. There is no commercial or industrial development in the vicinity of the Tierney Road homes.

3. The Savages purchased their Tierney Road property to build their own single-family home. The Savages intend to occupy this property as their primary residence. Mr. Savage testified that they intend to use and occupy the property as their "forever home."

4. The Savages expressed no prior intention to subdivide or sell off a portion of their Tierney Road property. They had no prior knowledge of, or association with, Mr. and Mrs. Snow or their dimensional stone and contracting business: Snowstone, LLC.

-4-

**Snowstone, LLC**

5. Snowstone, LLC is a Vermont limited liability company solely owned and operated by Jason and Kristy Snow as a dimensional stone, contracting and excavating business. Mr. and Mrs. Snow live in Springfield, Vermont and operate their business in the surrounding areas.

6. Dimensional stone is a specialty-crafted stone for use in patios, walkways, stone walls, and other residential and commercial settings. Dimensional stone is often extracted from small quarries, often while using hand tools, such as hammers and chisels, rather than large power equipment. A photograph of the hand tools Mr. Snow uses to extract and process dimension stone was admitted at trial as Exhibit 4. A photo of some of the dimensional stone that he has extracted from another quarry was admitted at trial as Exhibit 5.

7. Mr. Snow learned the craft of hand-extracting and processing dimensional stone while working for the Brown Construction Company. He purchased the assets of the Brown Construction Company in 2010 and used those assets (tools, etc.) to establish Snowstone, LLC.

8. Snowstone currently harvests dimensional stone from a small quarry located more than five miles away from the Savages' Tierney Road property. This quarry is known as the Graham Quarry. Mr. Snow uses hand tools to excavate and harvest dimensional stone from the Graham Quarry. See Exhibits 4 and 5.

9. The Graham Quarry is subject to an Act 250 permit. There was no testimony offered at trial that Snowstone has operated the Graham Quarry in violation of its Act 250 permit, nor any testimony that Snowstone had sought to evade Act 250 jurisdiction with respect to the Graham Quarry operation.

10. Mr. Snow determined that the dimensional stone deposits at the Graham Quarry were being depleted and he decided that he must begin to look for another source for dimensional stone. He hoped to continue to operate as a very small business, with only himself and one other employee extracting and processing the dimensional stone he harvested. When his work justifies it, Mr. Snow also has Snowstone hire one other employee, on a part-time basis.

11. An individual who was aware of the Savages' recent purchase of their Tierney Road property advised Mr. Snow that that there was a small stone quarry on the Savages' property. Since Mr. Snow did not know Mr. or Mrs. Savage, he asked this mutual acquaintance to ask Mr.

Savage if he would be willing to allow Mr. Snow to inspect the stone quarry on their property. At the time of this discussion, the Savages had begun the construction of their primary residence.

12.     Initially, Mr. Snow did not hear from Mr. or Mrs. Savage. Then, Mr. Savage appeared at the Graham Quarry, unannounced, while Mr. Snow was working there. Mr. Snow was not aware that Mr. Savage would be visiting his work site, but the two had a conversation.

13.     Mr. and Mrs. Savage did not previously know Mr. or Mrs. Snow. There was no testimony offered at trial that the parties have been friends or had any personal or business relationship. The Savages did not previously and will not have in the future any ownership interest in Snowstone.

14.     Mr. Savage was interested in viewing how Mr. Snow extracted and processed dimensional stone and asked if Mr. Snow's future operations at another site would be similar to his operations at the Graham Quarry site; Mr. Snow answered "yes." Mr. Savage then invited Mr. Snow to visit his Tierney Road property to inspect the area for use as a potential dimensional stone quarry.

15.     That same day, Mr. Snow met Mr. Savage at the stone quarry site on the Savages' property. Some stone had been harvested from this quarry many years ago, but no trial testimony revealed exactly when or for how long the prior quarry was operational.

16.     Mr. Snow was impressed with the quality of the stone on the Savages' property; he advised at trial that it was "beautiful" for dimensional stone purposes and that he was very excited about its potential use.

17.     The two discussed how they could proceed. They spoke that day about general terms, such as Mr. Snow purchasing a small portion of the Savage property so that he could harvest and process the dimensional stone on the Savages' property. Mr. Savage expressed a desire to keep the quarry area small, since he and his wife continued to intend to use the rest of their property as their principal residence.

18.     Mr. Snow also wished to keep the quarry area small for several reasons. First, he did not wish to acquire any more property than he needed to operate his small dimensional stone business. Second, he was aware that if his proposed quarrying operation could be kept under a certain area size, he may be able to avoid the need to obtain an Act 250 state land use permit.

**Identification of the Stone Quarry Site and Access Easement**

19.     Mr. Savage hired an engineer and attorney to assist in evaluating his proposed sale of the stone quarry site to Snowstone.  After consulting with the engineer and attorney, Mr. Savage hired a surveyor to survey and identify the exact area to be sold to Snowstone.

20.     The Savages' surveyor—David Rose—testified at trial.  He identified the stone quarry site as containing 0.64 acres of land.  The surveyor credibly testified that, due to the measurement equipment and software he uses to complete his surveys, they are "highly accurate."  A copy of Mr. Rose's survey of the quarry site was admitted at trial as Exhibit 2.

21.     Mr. Savage recommended that access to the stone quarry site could be accomplished via an old woods road to the quarry site that still existed and was in passable condition.  The width of the existing woods road varied slightly but does not appear to be more than sixteen feet in width at any one point.

22.     Mr. Savage and his surveyor then decided to plot out the location of an access easement over the Savages' property from the quarry site to the terminus of Tierney Road.  The location of this access easement is detailed on a second survey prepared by Mr. Rose and admitted into evidence at trial as Exhibit 1.

23.     The area to be encumbered by the access easement is approximately 0.29 acres.  Mr. Snow testified that he liked the suggestion of using the pre-existing woods road as access to the proposed quarry site because its current condition is sufficient for his planned use.  He proposes to travel on the woods road with his Ford F550 pickup truck, and to take no more than four round trips per day during his seasonal work at the quarry (April 1st to December 1st of each year).

24.     The Rose survey shows that the access road from the stone quarry site to the northerly end of Tierney Road is 1,636.2 feet in length.  Id.

25.     Mr. Snow estimated at trial that it will take him approximately five years to extract the usable dimensional stone from this quarry.  It may be necessary to conduct a blast at the quarry site, to help extract the usable stone.  Mr. Snow estimated that such a blast would occur no more than once a year.  The only other anticipated traffic would be a dump truck that would visit the site approximately once a week, to haul away the unusable stone and dirt.

26.     Mr. Savage also directed Mr. Rose to complete a survey of their entire property. A copy of that survey was admitted at trial as Exhibit 11.

**Savage to Snowstone Purchase and Sale Contracts**

27.     Mr. and Mrs. Savage decided to sell, and Snowstone decided to buy, the stone quarry site and access easement. The area of the quarry site and access easement totaled 0.93 acres. The parties negotiated the terms of their purchase and sale agreement and memorialized their agreement in a document entitled "Contract of Sale of Real Estate" which is dated May 2017.[2] A copy of this Contract was admitted at trial as Exhibit 8.

28.     The 0.64 acres to be sold to Snowstone includes several areas for the operation of a small dimensional stone quarry extraction operation. See Exhibit 2. The area includes an outcropping of stone that is labeled on Exhibit 2 as the "Initial Stone Processing Area." Id. That stone outcropping is also depicted on a photograph admitted at trial as Exhibit 6.

29.     Mr. Snow advised that he does not intend to dig below the ground level surrounding the outcropping of stone currently seen on site. He estimates that the stone extracted and processed on site will be loaded into his pickup truck and transported to a storage site at an industrial park that is more than five miles away.

30.     The parcel to be conveyed also includes areas identified as "Initial Parking & Loading Area," "Initial Stone Staging Area," and a "Proposed 12'± Wide Work Road To Access Top of Ledge Face" of the rear of the stone pile depicted in photo Exhibit 6.

31.     After reviewing the surveys Mr. Savage had prepared, Mr. Snow hired an attorney to assist Snowstone in determining whether he would need to obtain an Act 250 permit. Since the Town of Cavendish ("Town") does not have municipal regulations governing the subdivision or development of land, Mr. Snow and his attorney determined that municipal permits would not be needed for the extracting and processing of dimensional stone from the Savage quarry. However, because there were not Town subdivision or zoning bylaws, Mr. Snow's attorney advised that any commercial development on more than one acre of land would require Act 250 review and approval.

---

[2] We note that the parties did not fill in the specific day that they signed the Contract.

32.    Pursuant to the applicable statutes and regulations, Snowstone submitted a Verified Request for a Jurisdictional Opinion to the District Coordinator.  This Request is dated May 24, 2017 and was admitted at trial as Exhibit C.  The principal question posed by Snowstone's Request was whether the extraction and processing of dimensional stone from the surveyed site and transported over the surveyed access easement would be exempt from Act 250 jurisdiction, since the combined area of the to-be-sold site and access easement was less than one acre.

33.    The District Coordinator responded to Snowstone's Request by issuing JO #2-308, dated October 18, 2017.   In his JO, the District Coordinator reviewed the factual representations and legal arguments presented by both Snowstone and the Neighbors and the Coordinator's understanding of the applicable legal precedent.  He concluded that, due to several terms in the Savage to Snow Purchase and Sale Contract, the proposed transaction could not be considered "an arm's-length" transaction and that, because of that characterization, both the to-be-sold and retained parcels were controlled by the same "person" for purposes of determining Act 250 jurisdiction.  October 18, 2018 correspondence of District Coordinator Burke to Attorney Slason, at p. 12; a copy of this correspondence was admitted at trial as Exhibit E.  Since the combined parcels are over one acre in size and are located in a "one-acre town," the Coordinator concluded that an Act 250 permit would need to be obtained for the dimensional stone quarry to be operated as proposed.  Id.

34.    Snowstone responded to the District Coordinator's JO first by filing a timely appeal with this Court.

35.    Mr. Snow then sought to cancel his contract with the Savages and replace it with a revised contract that eliminated the terms that the District Coordinator relied upon to make his adverse determinations.   The parties negotiated their new contract and reduced it to writing in a document entitled "Contract of Sale of Real Estate," dated March 15, 2018.  A copy of this Contract was admitted at trial as Exhibit 9.

36.    The parties eliminated the following provisions of their prior Contract from May 2017 (Exhibit 8) from their revised Contract of March 15, 2018 (Exhibit 9); Coordinator Burke referenced some of the following terms in reaching his conclusion that the first Contract did not evidence an arm's-length transaction:

a.) The Savages will not receive at closing a right to reacquire the quarry site and easement under the terms of a right of first refusal under the same terms offered by another buyer;

b.) The Savages' deed to Snowstone will no longer certain a restriction on another use of the quarry property once Snowstone completes its extraction of dimensional stone; Snowstone's right to use and enjoy the property, as well as its successors and assigns, would no longer be restricted by the Savages.

c.) Snowstone will pay the full purchase price at closing, rather than making payments over time to the Savages, who were to hold a mortgage on the quarry parcel and easement until payment was made in full. As a consequence of the new contract term of full payment at closing, the Savages agreed to a reduced purchase price of $60,000.00. Snowstone will secure funding for the full purchase price from a separate bank or other lender.

37. Both Contracts contain a contingency that calls for the closing to occur only after Snowstone receives "all final state and local permits and approvals for operation of a stone quarry and termination and/or withdrawal of any legal actions or appeals regarding the stone quarry." See paragraph 6(a) in both Exhibits 8 and 9. The Court understood at the time of trial that the parties had not completed a closing on their revised Contract.

### Discussion

We begin our analysis with a material fact and resulting legal conclusion that do not appear to be in dispute: that the Town does not currently have in effect permanent zoning and subdivision regulations. The legal conclusion resulting from that fact is that any commercial or industrial development in that Town on more than one acre of land requires an Act 250 state land use permit. 10 V.S.A. § 6001(3)(A)(ii) (defining regulated development for purposes of Act 250 jurisdiction as "construction of improvements for commercial or industrial purposes on more than one acre of land within a municipality that has not adopted permanent zoning and subdivision bylaws").

We also note another set of facts and legal conclusions that do not appear to be in dispute: that the Savages' intention to subdivide their property, so that they may convey the identified parcel and easement to Snowstone does not require municipal or state land use approval. No municipal approval is needed for the proposed subdivision because the Town does not have municipal zoning or subdivision bylaws in effect; no state approval is needed because a single-lot subdivision, with no other subdivisions within a five-mile radius in the last five years,

does not come within the statutory definition of a state-regulated subdivision. See 10 V.S.A. § 6001(19)(A).

Thus, we focus our remaining legal analysis on determining whether the proposed extraction and processing of dimensional stone on the to-be-transferred site may be defined as commercial or industrial development that requires an Act 250 permit.

**I. Whether the doctrine of "involved land" impacts the present request.**

The District Coordinator and the parties have spent much time discussing the legal doctrine of "involved land," a doctrine whereby separate but adjoining parcels may be considered joined together for purposes of determining Act 250 jurisdiction. See Act 250 Rule 2(c)(12) (defining a "[t]ract of land [as] . . . one or more physically contiguous parcels of land owned or controlled by the same person or persons").

However, we note that while the statutory definition used when determining if Act 250 jurisdiction applies in a municipality <u>with</u> permanent zoning and subdivision bylaws specifically uses the phrase "on a tract or tracts of land, owned or controlled by a person," the jurisdictional definition at issue here (i.e.: a municipality <u>without</u> permanent zoning and subdivision bylaws) <u>does not</u> contain that phrase. Compare 10 V.S.A. §§ 6001(3)(A)(i) and (iii) with 10 V.S.A. §6001(3)(A)(ii); see also 10 V.S.A. §§ 6001(3)(A)(iv) (including the phrase "tract or tracts of land, owned or controlled by a person" within the definition of certain housing projects requiring an Act 250 permit).

We agree with Snowstone that to read into §6001(3)(A)(ii) a phrase that is not there is to ignore an oft-cited rule of statutory construction: that is, to presume that statutory drafting is done in a purposeful and advised manner. See State v. Richland, 2015 VT 126, ¶6, 200 Vt. 401 ("We start with the plain language of the statute, and if the meaning is clear, we will enforce it according to its terms. . . .. In doing so, we 'presume that all language in a statute was drafted advisedly, and that the plain ordinary meaning of the language used was intended.'") (quoting in part Comm. to Save Bishop's House, Inc. v. Med. Ctr. Hosp. of Vermont, Inc., 137 Vt. 142, 153 (1979)) (additional citation omitted); see also Re: Town of Williston Rd. Improvements, Dec. Ruling #381 at 6–7 (Vt. Envtl. Bd. Jan. 13, 2000) (noting that the omission of the phrases "'tracts,' 'owned or controlled,' and 'radius of five miles' . . . represent the legislature's considered intent

to limit Act 250 jurisdiction over" the type of development whose definition <u>did not</u> include those phrases) (citations omitted).

However, we recognize that the concept of "involved land" has a long history, as evidenced in the Act 250 Rules, applicable statutory definitions, and legal precedent. See Act 250 Rule 2(C)(5); 10 V.S.A. §6001(3)(A); <u>In re Stokes Commc'n Corp.</u>, 164 Vt. 30, 36 (1995) ("In determining amount of land involved for jurisdictional purposes, [the reviewing commission, board or court must look to] 'the area of the entire tract or tracts of involved land owned or controlled by a person . . .") (quoting former Envtl. Bd. Rule 2(A)(2), now codified as Act 250 Rule 2(A)(2)); see also <u>In re Gerald Costello Garage</u>, 158 Vt. 655, 656 (1992) (mem.) (defining a "tract of land" for jurisdictional purposes to include all contiguous land in common ownership, regardless of the functional relationship between the parcels).[3] We therefore must analyze whether the doctrine of "involved land" has an impact upon the jurisdictional challenge presented by Snowstone's appeal.

The circumstances are such that Snowstone's planned extraction and processing of dimensional stone will occur within an area that is smaller than the jurisdictional threshold that our Legislature created for purposes of Act 250 jurisdiction. If our Legislature intended Act 250 to regulate commercial or industrial development on any size parcel of land in a town like Cavendish, they could have drafted 10 V.S.A. § 6001(3)(A)(ii) in a manner to reflect that wish. However, the Legislature drafted the relevant statute in the manner that it did, which includes the omission of the other qualifying language contained in neighboring statutes. It is our duty to respect and abide by that legislative determination. Therefore, we conclude that the doctrine of "involved land" does not have an impact on our present analysis.

---

[3] We note that the <u>Stokes</u> precedent is not particularly helpful here. In <u>Stokes</u>, a telecommunications tower operator leased a one-acre parcel from the owner of a 93-acre parcel and sited a 300-foot telecommunications tower on the leased land. Stokes challenged the Act 250 jurisdiction over the tower project, asserting that jurisdiction did not attach, since the tower was located on a leased parcel containing less than ten acres of land. Additionally, the Town of Randolph, where the tower was sited, had adopted permanent zoning and subdivision bylaws, thereby making it a "ten-acre town" for Act 250 jurisdictional purposes.

The Supreme Court rejected Stokes' assertions, concluding that the entire tract of land must be considered for jurisdictional purposes, since the owner retained an ownership interest and control over the entire tract. <u>Stokes</u>, 164 Vt. at 36–7.

**II. Whether the transaction between the Savages and Snowstone occurred at "arm's length."**

In this last stage of our analysis, we turn to the question of whether the revised Contract between the Savages and Snowstone may be classified as an "arm's length" transaction. We first note that, unlike in Stokes, the parties' Contract does not call for or allow the Savages to retain any ownership or controlling interest over the parcel to be sold to Snowstone, nor in the access easement to be conveyed to Snowstone. Further, the revised Contract does not include the right of first refusal, nor the restriction on future development, both of which were terms identified by the District Coordinator as contributing to the basis for concluding that the Savages would be retaining a controlling interest in the to-be-sold parcel, which in turn formed the basis for the Coordinator to conclude that the entire Savage parcel was subject to Act 250 jurisdiction.

Indeed, at the close of Snowstone's case in chief, the Neighbors "represented that they did not have testimony or other evidence to contradict Snowstone's evidence concerning the revised Purchase and Sale agreement and the assertion that the proposed sale would be an 'arm's length' transaction." Snowstone, No. 151-11-17 Vtec, slip op. at 3. At trial the Neighbors' attorney provided a thorough cross-examination of Mr. Snow, Mr. Savage, and his surveyor, Mr. Rose. However, the Court found the testimony of these three witnesses to be very credible and conclude that the cross-examination did not weaken that credibility.

A legal determination of what constitutes an arm's length transaction has often governed whether a person "controls" more than the jurisdictional limit on acreage for purposes of determining Act 250 governance. We have been provided with a common-sense definition for the term "control" in this context: "[t]o exercise restraining or directing influence over;" to "regulate; restrain; dominate; curb; to hold from action; overpower; counteract; govern . . .." In re Vitale, 151 Vt. 580, 584 (1989) (quoting Black's Law Dictionary 298 (5th Ed. 1979); Webster's New Collegiate Dictionary 245 (1981)).

The Vitale decision provides an excellent example of the concept of control that should result in a determination of when Act 250 jurisdiction applies. In Vitale, Mr. Vitale sought to purchase what was originally identified as a 1.57± acre portion of a larger parcel of land in the Town of Rutland, which was at that time a "one acre" town. Id. at 580. Mr. Vitale had sought to use the site for his concrete step manufacturing business. Id.

-13-

However, prior to closing, Mr. Vitale directed that the sellers convey the property in two parcels, the first having less than an acre, and the second having the remaining acreage. The Supreme Court noted that Mr. Vitale "assisted the sellers in obtaining the permits necessary to effectuate the [further] subdivision." Id. at 581. The Court also noted that the to-be-conveyed "property was [further] subdivided in this manner in order to avoid Act 250 jurisdiction." Id. at 580.

In actuality, at the time of the closing, Mr. Vitale refused to accept the deed for the remaining property and only accepted the deed for the parcel containing 0.99 acres. The sellers agreed to this demand after Mr. Vitale agreed to pay the full contract price, even though he was only receiving two-thirds of the property called for in the contract. Id. Twenty-five days later, on November 26, 1985, the sellers conveyed to Mr. Vitale the second parcel containing the remaining 0.58 acres that was called for in the parties' original contract. Mr. Vitale paid no further compensation for the second parcel, other than the reimbursement of the sellers' attorneys' fees for the second transfer.

The late Associate Justice Peck, who was well known for his well-reasoned dissents, offered a distinction that should be employed when trying to determine whether a party is attempting to "avoid" the law, or attempting to "evade" the law:

> It is a truism that it is entirely proper, legally as well as morally, to "avoid" a law but not to "evade" it. The practical--and legal--application of this truism allows all of us, as a matter of right, and in any field controlled generally by legislative enactments, to take advantage of a circumstance, however narrow and obscure it may be, that is not, in law and fact, covered by the enactments. This is true regardless of a close relationship between what is and what is not controlled by the legislation. These openings may be intended by the Legislature, or they may be inadvertent. However, if the opening does exist, it is an egregious abuse of judicial power for a court or quasi-judicial body, in its creative arrogance, to seal off a citizen's right to take advantage of it. It is the exclusive prerogative of the Legislature under Chapter II, § 5 of our State Constitution (separation of powers), to address the issue, and to change or modify it through the amendatory process if it sees fit to do so.

Vitale, 151 Vt. at 589 (Peck, J., dissenting).

The Vitale case presents a multi-layered picture of a developer orchestrating a scenario that clearly showed his attempt to exert control over the entirety of a sellers' subdivision and sale of a portion of his property.

In contrast, Snowstone's proposal exhibits no control, domination or governance by Snowstone over the Savages' property or anything other than the 0.93-acre portion to be conveyed. The same is true of Mr. and Mrs. Savage: they will have no control, ownership, or governance over either Snowstone or the property once it is conveyed. The principals of Snowstone and the Savages had no prior relationship, business or personal, and the transaction they contemplated evidences no business or personal relationship between them after they complete their transaction, other than being separate owners of separate, but neighboring properties.

In contrast to the transaction at issue in Vitale, we conclude that the proposed transaction between the Savages and Snowstone only evidence separateness and independence between these parties and the properties they are to separately own. The facts presented to us only evidence an arm's length transaction between the parties. We conclude that Mr. Savage and Mr. Snow's negotiations involved some common goals, one of which was to "avoid" Act 250 jurisdiction. However, their actions do not evidence an attempt to unlawfully "evade" the law. We therefore conclude that the parties' revised Contract represents an arm's length transaction and that, based upon the credible facts presented, it cannot be said that either party will own, control, or govern the other, or the property that they will separately own.

### Conclusion

For the reasons set forth above, we conclude that the doctrine of "involved land" is inapplicable in the present appeal, as the Town of Cavendish is a "one acre town" and the applicable statutory definition does not include the relevant "involved land" language.

We further conclude that, the Savages' proposed sale to Snowstone is an arm's-length transaction and that the to-be-conveyed parcel and the retained parcel should not be considered as owned or controlled by the same "person" for purposes of Act 250 jurisdiction. This is because, the Savages do not retain sufficient ownership or control over the parcel and easement to be conveyed to Snowstone that would justify our conclusion that the Savages, as sellers, will retain

-15-

sufficient ownership and control of the Snowstone parcel, such that the Savages and Snowstone should be considered a single 'person' for purposes of Act 250 jurisdiction.

Having reached these conclusions, we return to the procedural directives contain in our June 14, 2018 Interim Order and direct the following:

1. Snowstone, LLC shall promptly (but in any event on or before **Thursday, December 27, 2018**) make application to the Vermont Agency of Natural Resources or its subdivisions, including the Department of Environmental Conservation, for all stormwater and discharge permits required for the proposed quarrying operation.

2. Snowstone, LLC or its agent(s) shall transmit copies of the permit application(s) and supporting materials upon Neighbors' counsel via e-mail or first-class mail on the same day as it is submitted.

3. Any Snowstone permit application pertaining to this proposed quarry project shall include a request that the Neighbors be included on an Interested Persons List, pursuant to the Environmental Protection Rules, Chapter 18, Stormwater Management Rule § 18-308(d).

4. Snowstone will not contest Neighbors' standing in permitting proceedings concerning the proposed quarry or Neighbors' status as "persons aggrieved" for purposes of standing to intervene in the permitting process or to appeal under the Rule, §18-314 and 10 V.S.A. Chapter 220.7.

5. Snowstone shall advise the Court and Neighbors' counsel within ten (10) calendar days of any determination or withdrawal of any permit applications made to the Vermont Agency of Natural Resources or its subdivisions, including a determination that no permit is required for the proposed project.

6. Within thirty (30) days of such determination or withdrawal, any Party to this jurisdictional opinion appeal may request that the Court conduct a further hearing on whether any stormwater permit determination has a relevancy to the legal issue of whether all activities necessary for the operation of the proposed dimensional stone quarry can occur within the 0.93 acres that Snowstone proposes to purchase. In the event that such a request is made, the Court will schedule a further hearing. Any party aggrieved by this Court's final decision shall have a right to file a timely appeal within thirty (30) days of such final decision and judgment order.

7. In the event that no Party requests a further hearing, then this Court will issue a final entry of judgment, noting that its initial determination concerning this jurisdictional opinion appeal has then become final, subject to any rights of appeal.

8. Neither Snowstone nor any agent thereof shall extract or process stone or engage in any commercial quarrying activity on the Subject Parcel until all determinations in the present appeal and determinations in proceedings relating to applicable stormwater discharge permits become final, including exhaustion of appellate remedies.

Electronically signed on November 27, 2018 at Burlington, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division