NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 57

No. 2019-082

| | |
|---|---|
| In re Mountain Top Inn & Resort, JO 1-391 (Katherine Hall, Appellant) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | September Term, 2019 |

Thomas S. Durkin, J.

James A. Dumont of Law Offices of James A. Dumont, P.C., and Gillian C.A. Cowley, Law Clerk (On the Brief), Bristol, for Appellant.

Christopher D. Roy and Alexis L. Peters of Downs Rachlin Martin PLLC, Burlington, for Appellee.


PRESENT: Robinson, Eaton and Carroll, JJ., Dooley, J. (Ret.), and Wesley, Supr. J. (Ret.), Specially Assigned


¶ 1. **CARROLL, J.** Katherine Hall appeals from the Environmental Division's decision granting summary judgment to Chittenden Resorts, LLC and RMT Associates, d/b/a Mountain Top Inn & Resort (the Resort). The Environmental Division concluded that the Resort did not need an amended Act 250 permit to run a rental program where, pursuant to a contractual agreement, the Resort rents out private homes near the Resort. On appeal, Ms. Hall argues that the Environmental Division erred in determining that the Resort did not need an amended Act 250 permit. Specifically, she argues that the Resort needs an amended Act 250 permit because under 10 V.S.A. § 6001(14)(A), the Resort and owners of the homes involved in the rental program are

a collective "person." Alternatively, Ms. Hall argues that the Resort exercises "control" over the rental homes within the meaning of § 6001(3)(A)(i). We affirm the Environmental Division's conclusion that the Resort does not need to seek to amend the Act 250 permit governing the Resort property to include the private homes.

## I. Legal Framework

¶ 2. We begin with a brief overview of the relevant Act 250 statutes and regulations. "[T]he purpose of Act 250 is to protect and conserve the lands and environment of the state from the impacts of unplanned and uncontrollable changes in land use." In re N.E. Materials Grp. LLC Act 250 JO #5-21, 2015 VT 79, ¶ 25, 199 Vt. 577, 127 A.3d 926 (quotation omitted). To accomplish this goal, Act 250 "prohibits parties from subdividing land or commencing development without a permit." In re SP Land Co., 2011 VT 104, ¶ 24, 190 Vt. 418, 35 A.3d 1007 (citing 10 V.S.A. § 6081(a)).

¶ 3. In terms of development specifically, Act 250—and its accompanying regulations—require a new permit for "commenc[ing] development" or "substantial[ly] chang[ing]" a pre-existing development, 10 V.S.A. § 6081(a)-(b), and an amended permit for "material[ly] chang[ing] . . . a permitted development," Act 250 Rules, Rule 34(A), Code of Vt. Rules 12 004 060 [hereinafter Act 250 Rules], https://nrb.vermont.gov/sites/nrb/files/documents/2015%20Adopted%20Rules.pdf [https://perma.cc/M83J-DLG5]; see also In re Request for Jurisdictional Op. re Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A, 2015 VT 41, ¶ 7, 198 Vt. 510, 117 A.3d 457 ("The rules implementing the statute also require application for a permit if there is a substantial change to any preexisting development and application for an amended permit if there is a material change to any permitted development."). Development is defined as "[t]he construction of improvements on a tract or tracts of land, owned or controlled by a person." 10 V.S.A. § 6001(3)(A)(i) (emphasis added).

2

¶ 4.   What is disputed here is the meaning of the statutory terms "control[]" and "person." Id. § 6001(3)(A)(i).  Although control is not defined in the statute, § 6001 provides "person":

> (i) shall mean an individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership;
>
> (ii) means a municipality or State agency;
>
> (iii) includes individuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the partition or division of land;
>
> (iv) includes an individual's parents and children, natural and adoptive, and spouse, unless [specific criteria are met].

Id. § 6001(14)(A).   The Act 250 Rules further define person "[f]or the purposes of a 'development' " as:

> [A]n individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership; a municipality or state agency; and, individuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the 'development' of land.

Act 250 Rule 2(C)(1)(a).

¶ 5.   With that relevant legal background, we turn the facts of this particular case.

## II.  Facts

¶ 6.   Unless otherwise noted, the undisputed facts are as follows.  The Resort owns and operates the Mountain Top Inn & Resort, which is located on Mountain Top Road in Chittenden, Vermont.  As explained by the district coordinator in his jurisdictional opinion, while the Resort initially predated Act 250,[1] it has since gone through several permitting iterations.  Act 250

---

[1]   Act 250 exempts "development commenced before June 1, 1970 (the date Act 250 became law)."  In re N.E. Materials Grp. LLC Act 250 JO #5-21, 2015 VT 79, ¶ 15 (citing 10 V.S.A. § 6081(b)).

3

jurisdiction first attached to the Resort in 1974 because "of a proposed 'substantial change' to the resort, namely, the addition of 7 lots and [a] 1500 [foot] access road." The Resort subsequently "obtained other Act 250 permits or permit amendments to subdivide and to create multiple lots for private family residences." More recently, the Resort received a permit amendment for a newly constructed subdivision known as Trailside Cottages, which contains eleven private residences.

¶ 7. Several independently owned homes are located in the general vicinity of the Resort along Mountain Top Road and other nearby roads. The owners of these homes can voluntarily enroll in a short-term rental program pursuant to which they allow the Resort to "use reasonable efforts to rent" their homes to "suitable tenants." Each homeowner that enrolls in the rental program signs a standardized property rental agreement. Pursuant to the rental agreement, homeowners grant the Resort "all necessary powers, easements and rights of ingress and egress" to perform "rental, cleaning, and management services" for the property. The Resort specifically agrees to "handle all communications and negotiations with [guests]," and provide "maid service, linen service, and [a] starter set of household supplies (soap, paper towels, toilet tissue, trash bags, fire starter, dishwasher detergent, and dishwashing liquid)." For performing these services, the Resort retains a percentage of the "gross rental receipts" it collects on behalf of the owners when the homes are rented.

¶ 8. The homeowners, on the other hand, are responsible for "completely" furnishing, equipping, and maintaining the "premises in a rentable, suitable condition to accommodate the stated maximum number of occupants." The rental agreement further specifies that homeowners must, at a minimum, provide "a toll-call screened telephone, color TV/VCR, full-strength vacuum cleaner, all furniture, furnishings, appliances, cooking and eating utensils, blankets and pillows, [and] smoke detectors, fire extinguishers, fireplace tools, flashlight, plunger, snow shovel and maintenance equipment." If homeowners fail to provide the required furnishings or equipment, the rental agreement authorizes the Resort to "purchase or otherwise provide for any such

4

furnishings or equipment deemed necessary." Similarly, the rental agreement authorizes the Resort, upon notice to the homeowners, to makes necessary repairs to the property not exceeding $500. However, the Resort at its "sole option" may "make any repairs necessary when damage to the Property is imminent and notice to Owner cannot be made within a reasonable amount of time." The Resort deducts any expenses it incurs repairing the property from the rental payments it collects.

¶ 9. Homeowners that wish to occupy, repair, or inspect their homes are required to provide at least twenty-four hours' notice to the Resort. The rental agreement provides that the Resort "will attempt to accommodate the Owner but can make no guarantee for use of Property," and occupancy "will be subject to all confirmed reservations." Either party can terminate the rental agreement, "with or without cause," upon thirty days' written notice. If homeowners enrolled in the program wish to sell their homes, they are required to give the Resort thirty days' written notice prior to the date the property is listed, and the rental agreement will automatically terminate on the closing date. If the rental agreement is terminated, either by sale or notice, homeowners are required to honor "all previously confirmed rentals."

¶ 10. Guests staying at homes enrolled in the rental program (rental homes) check in and out at the Resort and are considered resort guests. They accordingly have access to all the Resort's facilities and activities. As of August 22, 2018, approximately twenty-three to twenty-six homes were enrolled in the rental program.[2] The extent to which the rental homes are occupied, by either guests or their owners, varies significantly.[3]

---

[2] The exact number of homes participating in the rental program is disputed, but the Resort concedes that "the precise number of homes is immaterial to the issues at bar."

[3] The Environmental Division described the average yearly occupancy of the rental homes as follows:

> a. In 2016, the number of nights that the individual [r]ental [h]omes were occupied by guests ranged from 23 to 223, with some

5

¶ 11. The Environmental Division found that "the permit status of the Resort Property and the [rental] [h]omes [is] convoluted and confusing, dating back to before the Resort's ownership of the Resort Property." The majority of homes in the general vicinity of the Resort are located on land that was subdivided out of the Resort. Although some of the homes are currently subject to the Resort's Act 250 permit, the parties dispute whether some or all of the homes are in subdivisions that are subject to separate Act 250 permits. To clarify the permit status of the Resort and the rental homes, the Resort submitted a request for a binding jurisdictional opinion[4] as to whether the rental homes were subject to the Resort's Act 250 permit.

¶ 12. On February 23, 2017, District Coordinator William T. Burke issued a jurisdictional opinion in which he concluded that the Resort needed an amended Act 250 Permit to continue operating the Rental Program:

> In summary . . ., it is my opinion that the effective expansion of the capacity and uses at the permitted resort facilities and historical subdivisions, beyond the permitted capacities and uses, constitutes a substantial change to any preexisting features of the resort and a material change to permitted facilities and homes.

[r]ental [h]omes being occupied by the owners as many as 102 nights during the year.

b. In 2015, the number of nights that the individual [r]ental [h]omes were occupied by guests ranged from 53 to 180, with some [r]ental [h]omes being occupied by the owners as many as 145 nights during the year.

c. In 2014, the number of nights that the individual [r]ental [h]omes were occupied by guests ranged from 13 to 184, with some [r]ental [h]omes being occupied by the owners as many as 63 nights during the year.

[4] 10 V.S.A. § 6007(c) provides that "any person may . . . request a jurisdictional opinion from the district coordinator concerning the applicability of [Act 250]." See also Act 250 Rule 3(A) ("Any person seeking a ruling as to whether an activity [is subject to Act 250 jurisdiction] may request a jurisdictional opinion from a district coordinator . . . .").

(Footnote omitted.)  The district coordinator further explained that he disagreed with the Resort's characterization that "the fundamental jurisdictional question [was] 'whether jurisdiction would extend to [r]ental [h]omes not owned or controlled by the Resort.' "  The district coordinator explained:

> Th[e] [Resort's] characterization implies that the resort's ownership and/or control of the [rental] homes is insufficient to support the assertion that use of the homes constitutes a substantial or material change to the Resort's permitted activities.  Upon receipt of the [Resort's] request [for a binding jurisdictional opinion], I requested that [the Resort] provide a copy of the [rental agreement].
>
> . . . .
>
> Having reviewed the terms of the contract, I conclude that the contract evidences sufficient control over the properties to treat the resort and the property owners as the same 'person' under 10 V.S.A. § 6001(14)(A).
>
> I conclude, in other words, that the resort effectively controls the 26 homes for the purposes [of] Act 250 jurisdiction.

(Footnote omitted.)

¶ 13.  On March 17, 2017, the Resort appealed the district coordinator's jurisdictional opinion to the Environmental Division of the Vermont Superior Court.  As counsel explained during oral argument, Ms. Hall cross-appealed as an "aggrieved" person because she lives across the street from the Resort's main parking lot.[5]  Ms. Hall subsequently filed a motion for summary judgment arguing that the Resort needed an amended Act 250 permit because (1) the owners of the rental homes and the Resort were a "person" within the meaning of Act 250 Rule 2(C)(1)(a) as they were affiliated with each other for profit, and (2) the rental program amounted to a material or substantial change to the Resort.  The Resort filed a cross-motion for summary judgment arguing

---

[5]  Section 8504 provides a right of appeal to "any person aggrieved by an act or decision of the . . . District Commission."  Id. § 8504(a); see also id. § 8502 (defining "[p]erson [a]ggrieved" as "a person who alleges an injury to a particularized interest protected by the provisions of law listed in section 8503 . . . attributable to an act or decision by a district coordinator").

7

that the Resort and owners of the rental homes were not a "person" because they were not a "joint venture" under Vermont law and the statutory provision defining "person" to include those "affiliated with each other for profit" applies only to the subdivision, not the development, of land.

¶ 14.    On August 22, 2018, the Environmental Division granted the Resort's motion for summary judgment.  First, the Environmental Division concluded that the Resort and the rental homes were not a collective person under Rule 2(C)(1)(a).  The Environmental Division explained that although § 6001(14)(A)(iii) and Rule 2(C)(1)(a) define "person" for purposes of development to include "individuals and entities affiliated with each other for profit," § 6001(14)(A)(iii) uses the same definition of person but specifically limits its application to "profit, consideration, or any other beneficial interest derived from the <u>partition or division of land</u>." (Emphasis added.)  Citing the legislative history of § 6001(14)(A)(iii), and former decisions from this Court, the Environmental Division concluded that subsection (iii) applies only to the subdivision of land.[6]  It therefore held that it was "unable to apply Rule 2(C)(1)(a) because it would impermissibly expand

---

[6] The Environmental Division quoted the following excerpt from the 1987 Act that added subsection (iii) to the statutory definition of person in § 6001:

> It is the finding of the general assembly that the state of Vermont is experiencing a significant increase in the number of land subdivisions which are made for speculative purposes; that some of these subdivisions are eroding the natural resource base upon which Vermont's agricultural, forestry, mineral and recreational industries depend; that some of these subdivisions have the potential of imposing significant financial burdens upon local communities providing municipal and educational services; that it the policy of the state of Vermont to ensure that major subdivision activity within the state comply with the criteria of Vermont's Land Use and Development Law (Act 250), in order to protect the public health, safety and general welfare; and that in order to ensure appropriate Act 250 review, it is necessary to treat persons with an affiliation for profit, consideration, or some other beneficial interest derived from the partition or division of land as a single person for the purpose of determining whether a particular conveyance is subject to Act 250 jurisdiction.

1987, No. 64, § 1.

8

Act 250 jurisdiction beyond what the Legislature has authorized." Second, the Environmental Division explained that "[w]hile the motions focus on whether the Resort and [r]ental [h]ome owners are collectively a 'person' that owns or controls the [r]ental [h]omes, a precursor question . . . is whether the Resort, alone, controls the [r]ental [h]omes for Act 250 purposes." The Environmental Division concluded that under "analogous guidance provided by [the] Supreme Court . . . the Resort alone does not exercise sufficient control over the [r]ental [h]omes."

¶ 15.     On September 19, 2018, Ms. Hall requested that the Environmental Division amend its judgment pursuant to Vermont Rule of Civil Procedure 59. Ms. Hall specifically argued that the Environmental Division did not have the authority to rule on the lawfulness of Rule 2(C)(1)(a); rather, she argued that under 10 V.S.A. § 8503(e) the Civil Division of the "Washington Superior Court ha[d] exclusive jurisdiction to entertain a challenge to the lawfulness of the rule." In an entry order addressing this motion, the Environmental Division acknowledged that it did not have "jurisdiction over challenges to the validity or lawfulness of Act 250 Rules." Nevertheless, the Environmental Division reasoned that in applying Act 250 Rules, it was required to "avoid extending them 'beyond the jurisdictional limits of the [enabling] statute.' " (Alteration in original.) The Environmental Division explained that it "did not declare Rule 2(C)(1)(a) invalid on its face"; instead, it "concluded that Ms. Hall's suggested application of [the Rule] to the specific facts of this case overextended the Rule."[7]

---

[7] In its summary-judgement decision, the Environmental Division alternatively held that "even if Rule (2)(C)(1)(A) applies, the Resort and [r]ental [h]ome owners do not qualify as a 'person' under the Rule" because "the [r]ental [h]ome owners exercise no control over the Resort Property." (Emphasis added.) In response to Ms. Hall's Rule 59 motion, the Environmental Division acknowledged that its decision "overlooked the fact that [§ 6001(3)(A)(i)] and Rule (2)(C)(1)(a) . . . contemplate ownership as an alternative to control, so the lack of collective control would not necessarily negate Act 250 jurisdiction if there was collective ownership instead." The Environmental Division therefore vacated this "determination" but concluded that it "need not further revise [the summary-judgment decision] because of [its] separate initial conclusion that Rule 2(C)(1)(a) [could not] be applied."

9

¶ 16. On appeal, Ms. Hall maintains that the Environmental Division "in effect" ruled on the validity of Rule 2(C)(1)(a), "which it lacked jurisdiction to do." Assuming the Environmental Division had authority to rule on the validity of Rule 2(C)(1)(a), Ms. Hall contends that it still erred because the Rule "is narrower than and consistent with the jurisdictional statute." Alternatively, Ms. Hall argues that the rental agreement is sufficient "to demonstrate control for jurisdictional purposes of Act 250." The Resort, on the other hand, argues that applying Rule 2(C)(1)(a) to the Resort and the rental homes would improperly expand Act 250 jurisdiction. In addition, the Resort contends that the voluntary contractual relationships under the rental agreement do not create the necessary control to establish Act 250 jurisdiction.[8]

¶ 17. We first conclude that the Environmental Division had jurisdiction to determine the validity of Rule 2(C)(1)(a) in the context of an appeal of a jurisdictional opinion. Second, we conclude that the Environmental Division correctly invalidated Rule 2(C)(1)(a) to the extent the definition of person in the Rule improperly expands the statutory definition of person for the purposes of development in § 6001(14)(A). Finally, we conclude that the Resort does not control the rental homes within the meaning of § 6001(3)(i). We therefore affirm.

III. Standard of Review

¶ 18. This Court reviews summary-judgment decisions from the Environmental Division de novo. In re 204 N. Ave. NOV, 2019 VT 52, ¶ 4, ___ Vt. ___, 218 A.3d 24. We do so "applying the same standard as the environmental court; hence, we will uphold a decision granting summary judgment if there are no genuine issues of material fact and the moving party is entitled

---

[8] Separate from this appeal, the Resort applied for a stand-alone permit governing the Resort that, with the exception of the Trailside Cottages, left out the rental homes and property not owned or controlled by the Resort. The district coordinator determined that the permit application was incomplete because it did not include the rental homes. While the Resort appealed the incompleteness determination, that appeal has been stayed because its outcome depends on the resolution of the present appeal.

to judgment as a matter of law." In re Diverging Diamond Interchange SW Permit, 2019 VT 57, ¶ 19, ___ Vt. ___, 218 A.3d 564 (quotation omitted). The "nonmoving party is entitled to the benefit of all reasonable doubts and inferences." Lawson v. Halpern-Reiss, 2019 VT 38, ¶ 21, ___ Vt. ___, 212 A.3d 1213 (quotation omitted). When there are cross-motions for summary judgment, however, "both parties are entitled to the benefit of all reasonable doubts and inferences when being considered as the non-moving party." Vt. Coll. of Fine Arts v. City of Montpelier, 2017 VT 12, ¶ 7, 204 Vt. 215, 165 A.3d 1065 (quotation omitted).

IV. Person

¶ 19. Ms. Hall first contends that the Environmental Division erred in determining that the Resort and owners of the rental homes were not a collective "person" under Rule 2(C)(1)(a) because (1) the Environmental Division "lacked jurisdiction to reject" Rule 2(C)(1)(a), and (2) assuming the Environmental Division had jurisdiction, the Rule is "narrower than and consistent with the jurisdictional statute." Each argument is considered in turn.

A. Jurisdiction

¶ 20. The parties dispute the jurisdictional limits of the Environmental Division as established by § 8503(e). As a threshold matter, however, the parties disagree on whether the Environmental Division ruled on the validity of Rule 2(C)(1)(a). The Environmental Division explained that it "did not rule on the general lawfulness, enforceability, or validity of Rule 2(C)(1)(a)." Distinguishing between as-applied and facial challenges, the Environmental Division claimed that it concluded that "Ms. Hall's suggested application of Rule 2(C)(1)(a) to the specific facts of this case" would exceed the statutory definition of person for the purposes of development. (Emphasis added.)

¶ 21. Ms. Hall argues that, despite the Environmental Division's conclusion that it was not invalidating the Rule, it "in effect found the rule unenforceable." The Resort argues in response that the Environmental Division did not declare Rule 2(C)(1)(a) "invalid or unlawful on its face."

11

Instead, the Resort argues the court construed the rule in a way that would not improperly expand Act 250 jurisdiction. We agree with Ms. Hall that the Environmental Division ruled on the validity of Rule 2(C)(1)(a).

¶ 22. "The distinction between facial and as-applied challenges . . . goes to the breadth of the remedy . . . ." Gross v. United States, 771 F.3d 10, 14-15 (D.C. Cir. 2014) (first alteration in original) (quotation omitted). In a facial challenge, a litigant argues that "no set of circumstances exists under which [a statute or regulation] [c]ould be valid." See State v. VanBuren, 2018 VT 95, ¶ 19, ___ Vt. ___, 214 A.3d 791 (quotation omitted); see also, e.g., Lucks Bros., Inc. v. Agency of Transp., 2014 VT 59, ¶ 18, 196 Vt. 584, 99 A.3d 997 (explaining that plaintiff had brought "facial challenge to the Agency's claims process, arguing that it [was] void and unenforceable"). The remedy in a successful facial challenge is that a court will invalidate the contested law. See Killington, Ltd v. State, 164 Vt. 253, 261, 668 A.2d 1278, 1284 (1995) (explaining that plaintiff's request for monetary relief was "inconsistent with a facial challenge" because facial challenges usually result in "invalid[ating] the regulation"). In an as-applied challenge, however, a party claims that a statute or regulation is invalid as applied to the facts of a specific case. See In re LaBerge NOV, 2016 VT 99, ¶¶ 25-26, 203 Vt. 98, 152 A.3d 1165; see also, e.g., Aranoff v. Bryan, 153 Vt. 59, 65, 569 A.2d 466, 470 (1989) (concluding that petitioner had brought as-applied challenge because she "attack[ed] the canon as it [was] applied and interpreted by her supervisor"). The scope of the remedy is an as-applied challenge is narrower. Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010). Although a court grants relief "to the parties before the Court," it does not necessary invalidate the contested law in its entirety. United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 477 (1995).

¶ 23. The Environmental Division claimed that it determined only that applying Rule 2(C)(1)(a) to the facts of this specific case would expand the statutory definition of "person" for the purposes of development in § 6001(14). The problem with this reasoning is that the

12

Environmental Division's conclusion did not rely on a specific set of facts to determine that Rule 2(C)(1)(a) expanded the statutory definition of person. The Environmental Division made a legal conclusion that Rule 2(C)(1)(a) expanded the statutory definition of person because it "conflat[ed] a 'person' involved in partition or division of land and a 'person' for purposes of development." This legal conclusion applies under every set of facts, not simply this one. Accordingly, despite its reasoning to the contrary, the Environmental Division concluded that Rule 2(C)(1)(a) was invalid to the extent that it expanded the statutory definition of person for the purposes of development in § 6001(14).

¶ 24. The question on appeal is accordingly whether the Environmental Division had jurisdiction to determine the validity of Rule 2(C)(1)(a). The Vermont Constitution provides that "[t]he judicial power of the State shall be vested in a unified judicial system which shall be composed of a Supreme Court, a Superior Court, and such other subordinate courts as the General Assembly may from time to time ordain and establish." Vt. Const. Ch. II, § 4. Unlike the Supreme Court, whose jurisdiction is defined by the Vermont Constitution, "[t]he jurisdiction of the trial courts is shaped by the legislature." State v. Saari, 152 Vt. 510, 518, 568 A.2d 344, 349 (1989). The Vermont Constitution specifically provides that all inferior courts "shall have original and appellate jurisdiction as provided by law." Vt. Const. Ch. II, § 31.

¶ 25. Consistent with its authority to establish subordinate courts, the Legislature created the Environmental Division of the Vermont Superior Court, which has exclusive jurisdiction over, among other things, all appeals of "acts or decisions of the Secretary of Natural Resources, district environmental coordinators, and District Commissions." 10 V.S.A. §§ 8501(1), 8503(a); Gould v. Town of Monkton, 2016 VT 84, ¶ 10, 202 Vt. 535, 150 A.3d 1084. Section 8503(e), however, specifies that the Environmental Division does not have jurisdiction over "appeals from [Act 250] rulemaking decisions by the [Natural Resources Board (NRB)]." 10 V.S.A. § 8503(e). Instead, appeals from Act 250 rulemaking decisions by the NRB are governed by the Vermont

13

Administrative Procedure Act (VAPA). Id. § 6025(b) (providing that NRB "may adopt substantive rules, in accordance with the provisions of 3 V.S.A. chapter 25, that interpret and carry out the provisions of [Act 250]"); 3 V.S.A. § 801(a) (explaining that chapter 25 "may be cited as the 'Vermont Administrative Procedure Act' "). VAPA, in turn, provides that "[t]he validity or applicability of a rule may be determined in an action for declaratory judgment in the [Civil Division of the] Washington Superior Court."[9] 3 V.S.A. § 807; see also 12 V.S.A. § 4711 (Declaratory Judgment Act) ("Superior Courts within their jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.").

¶ 26. Construing all these statutory provisions together, Ms. Hall argues that the Environmental Division lacks jurisdiction to invalidate Act 250 Rules. She contends that § 8503(e), in conjunction with VAPA, indicates that the exclusive way to challenge an Act 250 Rule is a declaratory-judgment action in the Civil Division of the Washington Superior Court. We disagree. The plain language of § 8503(e) and the larger statutory scheme lead us to conclude that parties may challenge an NRB rulemaking decision in accordance with VAPA by bringing a declaratory-judgment action in the Civil Division of the Washington Superior Court. There is no indication, however, that by establishing this avenue for challenging Act 250 rulemaking decisions, the Legislature intended to divest the Environmental Division of jurisdiction to invalidate an Act 250 regulation when exercising its exclusive jurisdiction over the subject matters outlined in § 8503.

---

[9] VAPA predates Vermont's Unified Court System. 4 V.S.A. § 1. Under Vermont's Unified Court System, the Civil Division of the Superior Court has "original and exclusive jurisdiction of all original civil actions, except as otherwise provided." Id. §§ 30, 31. Although § 807 of VAPA refers generally to the Washington Superior Court, 4 V.S.A. § 31 specifies that the Washington Superior Court's Civil Division has jurisdiction over an § 807 proceeding.

¶ 27. "Our objective in statutory interpretation is to construe and effectuate legislative intent behind a statute." Northfield Sch. Bd. v. Wash. S. Educ. Ass'n, 2019 VT 26, ¶ 13, ___ Vt. ___, 210 A.3d 460 (quotation omitted). "In accomplishing this, our first step is to examine the statute's language because we presume that the Legislature intended the plain, ordinary meaning of the statutory language." Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215. "[W]here there is ambiguity [in a statute], we look to the general context of the statutory language . . . ." Shea v. Metcalf, 167 Vt. 494, 498, 712 A.2d 887, 889 (1998).

¶ 28. Beginning with the plain text, § 8503(e) provides that the Environmental Division does not have jurisdiction over "appeals from [Act 250] rulemaking decisions by the [NRB]." 10 V.S.A. § 8503(e). By its plain text, the jurisdictional limitations in § 8503(e) apply to "appeals" of "rulemaking decisions by the [NRB]." The present case, however, does not involve an appeal of an NRB rulemaking decision; rather, it involves an appeal of a decision by a district coordinator, i.e., the issuance of a binding jurisdictional opinion pursuant to 10 V.S.A. § 6007. Because this case does not involve an appeal of an NRB rulemaking decision, the jurisdictional limitations in § 8503(e) do not apply.

¶ 29. Contrary to Ms. Hall's suggestion, the larger statutory scheme confirms our reading of § 8503(e). While the Legislature explained that the purpose of creating the Environmental Division was to "consolidate existing appeal routes," it specifically emphasized in several different sections that it did not intend to replace the procedures outlined in VAPA for adopting or challenging rules. See 10 V.S.A. § 8501(1) (providing that the purpose of creating the Environmental Division was to "consolidate existing appeal routes" but specifically "excluding . . . the adoption of rules under [VAPA]"); id. § 8503(a) (excluding challenges to "rulemaking" from the Environmental Division's jurisdiction); id. § 6025 (providing that NRB "may adopt substantive rules, in accordance with the provisions of [VAPA], that interpret and carry out the

15

provisions of [Act 250]"). The Environmental Division does not have jurisdiction over challenges to Act 250 rulemaking decisions by the NRB because those challenges are governed by VAPA.

¶ 30. VAPA provides that parties "may" bring declaratory judgment actions in the Civil Division of the Washington Superior Court "if it is alleged that [a] rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff." 3 V.S.A. § 807. We have never explicitly addressed whether § 807 of VAPA provides the exclusive way to challenge an agency regulation. See Miller v. IBM, 163 Vt. 396, 398 n.2, 659 A.2d 1126, 1126 n.2 (1995) (declining to address defendant's arguments that that exclusive way to challenge agency rule is "declaratory judgment under 3 V.S.A. § 807"); Appeal of Stratton Corp., 157 Vt. 436, 440, 600 A.2d 297, 299 (1991) (declining to address Attorney General's argument that "the exclusive method to challenge the validity of a rule is by declaratory judgment action in Washington Superior Court as provided in 3 V.S.A. § 807"). However, the plain text of § 807, and our case law explaining why the Legislature created a declaratory-judgment remedy, indicate that § 807 of VAPA is not the exclusive way to challenge agency regulations.

¶ 31. Section 807 provides that parties "may" bring a declaratory judgment action in the Civil Division of the Washington Superior Court. The use of the word "may" indicates that a plaintiff is permitted, but not required, to file a declaratory judgment action to challenge an agency regulation. See May, Black's Law Dictionary (11th ed. 2019) (defining "may" as "[t]o be permitted to" and "[t]o be a possibility"). VAPA establishes a discretionary avenue for challenging regulations because a declaratory judgment action "is a cumulative remedy." Farm Bureau Mut. Auto. Inc. v. Houle, 118 Vt. 154, 158, 102 A.2d 326, 329 (1954). In fact, the Legislature created this additional remedy to correct "deficiencies in legal procedure." Poulin v. Town of Danville, 128 Vt. 161, 163, 260 A.2d 208, 209 (1969); see also 10B C. Wright & A. Miller, Federal Practice & Procedure § 2751 (4th ed. 2020) ("The declaratory-judgment remedy enlarges the judicial

16

process and makes it more pliant and malleable by putting a new implement at the disposal of the courts.").

¶ 32. The specific deficiency the Legislature intended to correct by creating the declaratory-judgment remedy was "the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating a suit at his leisure or—never." C. Wright & A. Miller, supra, § 2751 (quoting Japan Gas Lighter Ass'n v. Ronson Corp., 257 F. Supp. 219, 237 (D.N.J. 1966)) (interpreting Federal Declaratory Judgment Act); see also 12 V.S.A. § 4725 (explaining that Vermont's Declaratory Judgment Act "shall be so interpreted . . . as far as possible to harmonize with federal laws and regulations on the subject of declaratory judgments"). The declaratory-judgment remedy therefore "afford[s] one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued." C. Wright & A. Miller, supra, § 2751; Cooperative Fire Ins. Ass'n of Vt. v. Bizon, 166 Vt. 326, 330, 693 A.2d 722, 726 (1997) ("The [Declaratory Judgment] Act opened to plaintiffs at an early stage of the controversy a right to petition for relief not heretofore possessed." (alteration and quotation omitted)).

¶ 33. By establishing in VAPA that parties "may" challenge regulations via declaratory judgment actions, the Legislature did not intend to create an exclusive avenue for challenging regulations. Justice Dooley, post, ¶¶ 55-61, provides several additional persuasive reasons why VAPA is not the exclusive way to challenge agency regulations. Rather than creating an exclusive avenue for challenging agency regulations, VAPA merely establishes the Civil Division of the Washington Superior Court as the venue that hosts declaratory-judgment challenges to regulations.

¶ 34. The statutory scheme therefore confirms our reading of § 8503(e)'s plain text. The Legislature expressly provided that the Environmental Division does not have jurisdiction over challenges to Act 250 rulemaking decisions by the NRB because VAPA establishes a separate scheme for those challenges: a declaratory-judgment action in the Civil Division of the

17

Washington Superior Court. But, because VAPA is not the exclusive avenue for challenging agency regulations, the Environmental Division retains jurisdiction to consider the validity of Act 250 regulations to resolve particular disputes within its exclusive jurisdiction.

¶ 35. In sum, in § 8503(e) the Legislature merely reinforced that if parties want to challenge Act 250 rulemaking decisions by the NRB, they must follow the general procedures outlined in VAPA for challenging agency regulations. Reinforcing that challenges to Act 250 rulemaking decisions, like all direct challenges to agency regulations, are governed by VAPA in no way suggests that the Legislature intended to divest the Environmental Division of jurisdiction to invalidate agency regulations to resolve disputes within its exclusive jurisdiction. To hold otherwise would produce an absurd result: the Environmental Division would be required to apply Act 250 rules without regard to their validity.

### B. Rule 2(C)(1)(a)

¶ 36. Having established that the Environmental Division had jurisdiction to invalidate Rule 2(C)(1)(a), the next question is whether it properly concluded that the Resort and owners of the rental homes were not a collective person because the definition of person in Rule 2(C)(1)(a) expands the statutory definition of person for the purposes of development. "[U]nder our constitutional system, administrative agencies are subject to the same checks and balances which apply to our three formal branches of government." In re Agency of Admin., 141 Vt. 68, 75, 444 A.2d 1349, 1352 (1982). Because an agency has only the authority delegated to it by the legislature, In re Club 107, 152 Vt. at 322, 566 A.2d at 967, "an administrative body may promulgate only those rules within the scope of its legislative grant of authority," In re Vt. Verde Antique Int'l., Inc., 174 Vt. 208, 210-11, 881 A.2d 181, 183 (2002).

¶ 37. "To determine the scope of authority vested in an administrative agency by a statutory grant of power, we look to its enabling legislation." Id. at 211, 881 A.2d at 183. "When examining the legislative grant of authority to [an agency], we look to the plain meaning of the

18

statutory language . . . ." In re Huntley, 2004 VT 115, ¶ 6, 177 Vt. 596, 865 A.2d 1123.  We presume that "the Legislature intended the statutory language to carry its plain, ordinary meaning." C&S Wholesale Grocers, Inc. v Dep't of Taxes, 2016 VT 77A, ¶ 13, 203 Vt. 183, 155 A.3d 169. "Where the meaning of a statute is plain on its face, this Court will enforce the statute according to its terms." Id.  But, "where there is ambiguity [in a statute], we look to the general context of the statutory language." Shea, 167 Vt. at 498, 712 A.2d at 889.  We consider "the whole and every part of the statute," Herrick v. Town of Marlboro, 173 Vt. 170, 173, 789 A.2d 915, 918 (2001) (quotation omitted), and avoid a construction "that would render part of the statutory language superfluous," In re Margaret Susan P., 169 Vt. 252, 263, 733 A.2d 38, 47 (1999).

¶ 38.    Here, 10 V.S.A. § 6001(14)(A) provides four definitions of person:

> (i)  [A]n individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership;
>
> (ii) [A] municipality or State agency;
>
> (iii) [I]ndividuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the partition or division of land;
>
> (iv) [A]n individual's parents and children, natural and adoptive, and spouse, unless [specific criteria are met].

(Emphasis added.)  Pursuant to its authority to "adopt substantive rules . . . that interpret and carry out the provisions of [Act 250]," id. § 6025, the NRB promulgated Rule 2(C)(1)(a), which defines "person" for the "purposes of a 'development' " as:

> [A]n individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership; a municipality or state agency; and, individuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the 'development' of land.

Act 250 Rule 2(C)(1)(a) (emphasis added).

19

¶ 39. Ms. Hall argues that the Resort and owners of the rental homes are a collective person for the purposes of development within the meaning of Rule 2(C)(1)(a) because they are affiliated with each other for profit. The problem, however, is that § 6001(14)(A)(iii) defines person in the same way but limits its application to the "partition or division of land." 10 V.S.A. § 6001(14)(A)(iii). Act 250 defines "[s]ubdivision" in part as land that has been "partitioned or divided." Id. § 6001(19)(A)(i)-(iii). By its plain language, § 6001(14)(A)(iii) is applicable only to the subdivision of land. Rule 2(C)(1)(a) expands the definition of person in subsection (iii) to include the "development" of land.

¶ 40. Nevertheless, Ms. Hall argues that Rule 2(C)(1)(a) does not exceed the statutory definition of person because subsection (i) of the statutory definition—"an individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated ownership," 10 V.S.A. § 6001(14)(A)(i) (emphasis added)— is broad enough to encompass Rule 2(C)(1)(a). Ms. Hall submits that while subsection (i) uses "association," Rule 2(C)(1)(a) covers the narrower subset of "associations" that "are for mutual 'profit, consideration or other beneficial interest.' " Furthermore, Ms. Hall argues that the language of the Rule is "consistent with the statutory assertion of jurisdiction over any 'commercial entity' that is not a 'legal entity.' "

¶ 41. Although Ms. Hall provides a plausible reading of § 6001(14)(A)(i), she fails to consider "the whole and every part of the statute." Herrick, 173 Vt. at 173, 789 A.2d at 918. Section 6001(14)(A) needs to be interpreted as a whole, considering the limiting effect subsection (iii) has on subsection (i). Subsection (iii) provides that "person" includes "individuals and entities affiliated with each other for profit . . . derived from the partition or division of land." 10 V.S.A. § 6001(14)(A)(iii). It would render subsection (iii) superfluous if subsection (i) covered all "individuals and entities affiliated with each other for profit" for the purposes of development when subsection (iii) expressly limits that same language to subdivision. Accordingly, the

20

Environmental Division properly concluded that the Resort and owners of the rental homes were not a collective person because Rule 2(C)(1)(A)'s definition of person for the purposes of development improperly expands the statutory definition of person in § 6001(14).

## V. Control

¶ 42. Ms. Hall alternatively argues that the Resort needs an amended Act 250 permit to run the rental program because, pursuant to In re Ochs, 2006 VT 122, 181 Vt. 541, 915 A.2d 780 (mem.), the Resort controls the rental homes via the rental agreement. She submits that "[t]he Agreement grants the Resort exclusive rights to control rental, repair, cleaning and management of each property, . . . mandates which furnishings must be placed in each house; and does not allow the 'owner' back into the house without the Resort's permission." The Resort counters that the voluntary contractual relationships at issue here are insufficient to establish control for Act 250 jurisdiction.

¶ 43. As explained above, Act 250 jurisdiction attaches when development or subdivision occurs on tracts of land "owned or controlled by a person." 10 V.S.A. § 6001(3)(A)(i) (emphasis added). This Court has construed the term "control" in § 6001(3)(A)(i), and its corresponding regulations, on several occasions. As a basic matter, because "control and ownership are independent criteria" under the statute, State of Vt. Envtl. Bd. v. Chickering, 155 Vt. 308, 313, 583 A.2d 607, 610 (1990), we have construed the word control in terms of functional control, meaning whether a person has "exercise[d] restraining or directing influence over" a tract of land, In re Vitale, 151 Vt. 580, 584, 563 A.2d 613, 616 (1989) (quoting Control, Black's Law Dictionary 298 (5th ed. 1979)); see also In re Eastland, Inc., 151 Vt. 497, 499-500, 562 A.2d 1043, 1045 (1989) (same).

¶ 44. Even though "control and ownership are independent criteria," Chickering, 155 Vt. at 313, 583 A.2d at 610, in the first two instances we interpreted control—Vitale and Eastland—we addressed whether prospective buyers controlled land prior to acquiring legal title. See Vitale,

21

151 Vt. at 584, 563 A.2d at 616; Eastland, 151 Vt. at 499-500, 562 A.2d at 1045. In both cases, this Court held that even though the prospective buyers did not have legal title, they exercised sufficient control over the property by, among other things, facilitating the subdivision of the land. Vitale, 151 Vt. at 584-85, 563 A.2d at 616 (noting that "petitioner suggested the subdivision, carried out the survey, and obtained the necessary permits"); Eastland, 151 Vt. at 500, 562 A.2d at 1045 ("[The buyer] made arrangements with the surveyor, chose[] the number of subdivisions to create, directed where the survey lines should be drawn, and paid for the survey."). In both decisions, we emphasized the buyers' role as equitable owners of the property in determining that they exercised control. Vitale, 151 Vt. at 581, 584-85, 563 A.2d at 616 (affirming Environmental Board's conclusion that "petitioner 'controlled' both lots for purposes of Act 250 jurisdiction" even though "legal title remained in the seller" at the time of the subdivision); Eastland, 151 Vt. at 500, 562 A.2d at 1045 ("[The buyer]'s status as equitable owner conferred upon it sufficient control to induce the seller to assist [the buyer] by subdividing the property as [the buyer] wished.").

¶ 45. In Ochs, on the other hand, this Court considered when a person controls land regardless of ownership. In that case, the question was whether the Ochses controlled land through contractual agreements—namely, by leasing farmland from other landowners. 2006 VT 122, ¶ 14.[10] We explained that "the provisions of the leases make it apparent that the Ochses control farming operations on the leased land." Id. The Ochses had yearly leases in which they made "day-to-day decisions concerning the apple cultivation at the leased orchards" and used their own equipment to work on the land and trees. Id. The lessors, on the other hand, "exercise[d] no

---

[10] Act 250 exempts "[t]he construction of improvements for farming." 10 V.S.A. § 6001(3)(D)(i). Farming is defined, in part, as "the on-site storage, preparation and sale of agricultural products principally produced on the farm." Id. § 6001(22)(E). The specific legal question in Ochs was whether the Ochses exercised sufficient "control" over the leased apple orchards such that the apples they cultivated on leased land were "principally produced on the farm" and thus exempt from Act 250. 2006 VT 122, ¶ 14.

control over the Ochses' operations," except for "decisions about which trees may be felled." Id. ¶¶ 7, 14.

¶ 46. Like Ochs, the specific legal issue here is whether the Resort "exercise[s] restraining or directing influence over," 2006 VT 122, ¶ 14, the rental homes solely through a contractual relationship—the rental agreement. In determining whether a lessee controls a tract of land through a contract, Ochs directs us to consider the extent to which the lessee makes "day-to-day decisions concerning" the tract of land as well as the extent to which the owners themselves retain control. See id. ¶ 14. Considering these factors, especially as compared to the leases at issue in Ochs, the Resort does not exercise sufficient control over the rental homes via the rental agreement for the rental homes to fall under the Resort's Act 250 permit

¶ 47. The extent to which the rental agreement allows the Resort to control the rental homes is limited. Unlike the Ochses, who had almost complete control over the day-to-day decisions on the leased land, the rental agreement authorizes the Resort to perform solely "rental, cleaning, and management services" at the rental homes. It is true that while guests are staying at the rental homes, the Resort controls access to the rental homes and prevents owners from entering their own homes. But the duration of this control is significantly limited. While the Ochses had control over the leased lands on a yearly basis, the record demonstrates that the Resort rents the rental homes for significantly fewer periods of time: From 2014 to 2016, the most any single rental home was occupied by guests over the course of a year was 223 nights.

¶ 48. Because the Resort exercises limited control over the rental homes via the rental agreement, the homeowners retain significant control. First, unlike the Ochses, who used their own equipment on the leased lands, the rental agreement requires the homeowners—with the exception of basic household supplies like linens and cleaning supplies—to "completely" furnish and equip the rental homes. Second, although the rental agreement requires homeowners to notify the Resort to occupy their own homes, homeowners can occupy their homes for unlimited amounts

23

of time. In fact, the record demonstrates that homeowners occupy their own homes for extensive periods. For example, in 2015, one rental home was occupied by the owners for 145 nights. Finally, under the terms of the rental agreement, homeowners can terminate the agreement "at any time" with thirty days' written notice.

¶ 49.    In sum, based on our precedent in Ochs, the Resort does not control the rental homes within the meaning of § 6001(3)(A)(i).

Affirmed.

FOR THE COURT:

_____<br>Associate Justice

¶ 50.    **DOOLEY, J. (Ret.), Specially Assigned, concurring and dissenting.**    For the reasons stated herein, I concur with the majority that the Environmental Division had the authority to determine the validity of Natural Resources Board (NRB) Rule 2(C)(1)(a) in the context of adjudicating the parties' dispute in this case. In the concurring part of this opinion, I discuss additional reasons why 3 V.S.A. § 807 is not the exclusive means of challenging the validity or applicability of a regulation. I dissent, however, from the majority's determination that the Mountain Top Inn & Resort (the Resort) lacked sufficient control over the more than two dozen private homes it rents to its guests, pursuant to its rental agreement with the private home owners, to require inclusion of those guest houses in the Resort's amended Act 250 permit. On this point, the rental agreement gives the Resort a level of control beyond that required to trigger Act 250 jurisdiction, in view of our case law defining the required level of control, the legislative purpose underlying Act 250, and the potential environmental impacts of not including the guest houses in the permit in this case. Accordingly, I would reverse the Environmental Division's determination that the guest houses need not be part of the Resort's amended Act 250 permit.

24

# I.

¶ 51.    I first examine whether the Environmental Division could address the validity of NRB Rule 2(C)(1)(a).    Appellant argues that despite its statement to the contrary, the Environmental Division effectively struck down the NRB rule, in violation of two statutes.  The majority agrees that the Environmental Division struck down the rule but holds that the court had the jurisdiction to do so in an appeal from a district coordinator's jurisdictional opinion that the Resort needed an amended Act 250 permit to run its housing rental program, where the substance of the rule was challenged as inconsistent with the governing statute.  I agree with the majority that the Environmental Division correctly struck down the rule and that it was not prevented from doing so by 10 V.S.A. § 8503(e) because this action is not an appeal from the NRB.

¶ 52.    I also concur that the Environmental Division's action was not prohibited by 3 V.S.A. § 807 on the ground that this provision of the Administrative Procedures Act is the exclusive method of challenging the validity or applicability of a rule.  I write separately on this point because there are additional reasons why 3 V.S.A. § 807 cannot be given preclusive effect in this case.

¶ 53.    The statute that appellant claims prohibited the Environmental Division's consideration of the validity of the rule, 3 V.S.A. § 807, provides as follows:

> The validity or applicability of a rule may be determined in an action
> for declaratory judgment in the Washington Superior Court if it is
> alleged that the rule, or its threatened application, interferes with or
> impairs, or threatens to interfere with or impair, the legal rights or
> privileges of the plaintiff . . . .

Appellant argues that declaratory judgment in the superior court is the exclusive remedy to challenge the validity of a regulation.  The majority concludes, based primarily on the use of the word "may" to describe the availability of the remedy, that the declaratory-judgment remedy is permissive and not exclusive.  I agree with the majority's rationale and conclusion.  I note briefly that there are three additional reasons why the statute is not exclusive.

25

¶ 54. First, we have essentially decided this question, albeit in another context. We have limited the use of 3 V.S.A. § 807 in light of the existence of other procedures available to challenge a rule or determine its applicability. In Moore v. Gilbert, we ruled that § 807 could not be used to challenge a ratemaking rule of the Public Service Board because it interfered with legislative policy restrictions on ratepayers' rights in ratemaking proceedings. 132 Vt. 365, 367-68, 321 A.2d 13, 15 (1974). We applied the same principle in C.V. Landfill, Inc. v. Environmental Board, holding that the superior court could refuse to grant a declaratory judgment under § 807 where primary jurisdiction to apply a rule was properly with the Environmental Board. 158 Vt. 386, 391-92, 610 A.2d 145, 148 (1992); see also Travelers Indem. Co. v. Wallis, 2003 VT 103, ¶ 81, 176 Vt. 167, 845 A.2d 316 (applying C.V. Landfill decision to rules and practices of Department of Labor and Industries). C.V. Landfill involved judicial review of a district coordinator's jurisdictional opinion that Act 250 applied to a proposed development—the same situation present here—and the opinion relied upon the presence of the word "may" in the statute. See 158 Vt. at 391, 610 A.2d at 148. Finally, we examined the interrelationship between remedies available in a regulatory scheme and § 807 in Barnet Hydro Co. v. Public Service Board, 174 Vt. 464, 467, 807 A.2d 347, 350 (2002). In that case, we held that where there are alternative remedies to determine the validity of a regulation, and the affected party chooses to bring a declaratory-judgment action in the superior court, that court can decide that the alternative remedy is more appropriate and dismiss the superior court case. Id.

¶ 55. Although the contexts were different, the analyses and holdings of each of these cases is inconsistent with the argument that § 807 provides the exclusive method of challenging the validity of a rule. A short answer to appellant's argument is that we have already rejected it.

¶ 56. Second, while this case is about the validity of a rule, the statute also covers the "applicability" of a rule, the situation in C.V. Landfill. See 158 Vt. at 390, 610 A.2d at 147. In many areas of administrative adjudication, determining the applicability of a rule is a constant

26

issue. This is particularly true in areas, like zoning, where much of the applicable law is contained in regulations. Bifurcating rule-applicability cases in two different courts would add time and expense to judicial review for no apparent reason. The Environmental Division, for example, is far more experienced than the civil division in construing and applying regulations.

¶ 57.   Third, as we have noted before, 3 V.S.A. § 807 is part of a uniform act: § 7 of the 1961 Model Administrative Procedure Act. See Barnet Hydro Co., 174 Vt. at 466, 807 A.2d at 349-50. Although the 1961 version is outdated and has been overtaken by later versions, it was adopted by numerous states and has been construed by courts around the country. See Uniform Model State Admin. Proc. Act Refs & Annos (Unif. Law Comm'n 1961) (showing that twenty-seven states adopted 1961 Model Act in whole or in part). Some courts have decided the exact same question presented here and held that the language of § 7, as adopted in a state statute, does not create an exclusive remedy. See, e.g., Appeal of Cover, 134 A.3d 433, 436 (N.H. 2016) (taking "exception to the [New Hampshire Liquor] Commission's understanding of the word, 'may,' " and citing general rule of statutory construction that "may" is permissive, not mandatory); Williams v. Public Service Comm'n, 754 P.2d 41, 47 (Utah 1988) ("[A] construction of [the statute] that limits the method of review of rulemaking to a declaratory judgment action would contradict the statute's plain language. To so find would require this Court to ignore a basic tenet of statutory construction . . . and assert that 'may' is equivalent to 'shall.' "). Thus, the New Hampshire Supreme Court determined in Cover, contrary to the Public Service Commission's interpretation, that the word "may" in the statute indicated that a declaratory judgment action was but "one possible mechanism" by which the validity of the rule could have been challenged. Cover, 134 A.3d at 436. No court in the country has held that the language of § 7 of the Model Administrative Procedure Act of 1961 creates an exclusive remedy.

¶ 58.   There is also a more fundamental point here. At this juncture, the issue is whether this Court will conclude that NRB Rule 2(C)(1)(a) is valid. We make this decision directly and de

27

novo, without giving any deference to the Environmental Division's decision. C&S Wholesale Grocers, Inc. v. Dep't of Taxes, 2016 VT 77A, ¶ 10, 203 Vt. 183, 155 A.3d 169. If the Environmental Division could not determine the validity of the regulation, the remedy would be to delay conclusion of this case while the Resort sought review of the regulation in the civil division of the Washington Superior Court. That decision is, of course, reviewable here, putting the case back where it is today with no deference to the trial court decision. Thus, the separate review in the Washington Superior Court would be an expensive and delay-causing technicality of no substantive value.

¶ 59. This point is reinforced by the fact that judges sitting in the Environmental Division are superior court judges. 4 V.S.A. § 1001(c). They may be assigned to other divisions of the superior court for a period of up to two years and are routinely so assigned. Id., § 21a(c). If the Resort challenged the rule in the civil division of the Washington Superior Court, as appellant says it should have done, the Chief Superior Judge could have assigned an Environmental Division judge to hear the case, which would be a logical assignment because this is an Act 250 case. In other words, the case in the civil division could be decided by the same judge who is deciding the Environmental Division appeal, eliminating any possible reason why review in the civil division makes any sense. Even if I agreed that appellant's jurisdiction argument has validity, I could not vote for this technicality, which would only inflict delay and substantial costs on litigants.

II.

¶ 60. I now address the issue of whether the Resort had sufficient control over the guest houses to require their inclusion in the Resort's amended Act 250 permit.[11] Resolution of this issue requires an examination of the word "control" in Act 250, our past Act 250 case law

---

[11] It is important to recognize that this action may affect any Act 250 criterion at any location at the overall Resort development. For example, properly understanding the housing controlled by the Resort might lead to consideration of the wastewater effects of more people using the Resort's facilities.

construing that word, and the impacts of our ruling in this particular case. Upon doing so, I am convinced that the Resort's control of the guest houses is more than sufficient to require their inclusion in the Resort's amended Act 250 permit.

¶ 61. We implement the "bedrock rule" of construing statutes to give effect to legislative intent "by first examining the plain meaning of the language used in light of the statute's legislative purpose." Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129, 969 A.2d 54 (quotation and alteration omitted). Legislative "intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its reason, purpose and consequences." Id. (quotation omitted).

¶ 62. Shortly after Act 250's enactment, and consistently ever since then, this Court has recognized that the Legislature intended, through Act 250, to regulate the environmental impacts of any development exceeding the statute's jurisdictional threshold. In re Application of Great E. Bldg. Co., 132 Vt. 610, 614, 326 A.2d 152, 154 (1974) ("The nature and purpose of Act 250 is to protect and conserve the environment of the State to insure that lands slated for development are devoted to uses which are not detrimental to the public welfare and interest." (citing purpose stated in 1969, No. 250 (Adj. Sess.), § 1)); see also In re Vt. RSA Ltd. P'ship, 2017 VT 23, ¶ 9, 181 Vt. 589, 925 A.2d 1006 (mem.) (stating that "the underlying purpose of Act 250" is "to regulate the impacts of development" rather than "the purpose served" or "the parties benefitted by the construction"); N.E. Materials Grp. LLC Act 250 JO # 5-21, 2015 VT 79, ¶ 26, 199 Vt. 577, 127 A.3d 926 ("[T]he focus of Act 250 is regulating the impacts of development—in particular the impacts relating to the statutory Act 250 criteria.").

¶ 63. Regarding the issue of control, we have explicitly stated in past decisions that control is an independent criterion distinct from ownership, in terms of triggering Act 250 jurisdiction. See State of Vt. Envtl. Bd. v. Chickering, 155 Vt. 308, 313, 583 A.2d 607, 610 (1990). In contrast to ownership, control means "functional control." Id. We have interpreted the plain

29

meaning of the word "control" in the context of Act 250 by examining dictionary definitions. See In re Vitale, 151 Vt. 580, 584, 563 A.2d 613, 616 (1989) (determining meaning of word "control" in Act 250 by relying on Black's Law Dictionary and defining control as "exercise[ing] restraining or directing influence over" property); In re Eastland, 151 Vt. 497, 499-500, 562 A.2d 1043, 1045 (1989) (same). Black's Law Dictionary defines the word "control" as the "direct or indirect power to govern the management and policies of a person or entity, whether through ownership . . ., by contract, or otherwise; the power or authority to manage, direct, or oversee." Control, Black's Law Dictionary (11th ed. 2019).

¶ 64. Considering our accepted broad definition of control in conjunction with the purpose of Act 250 to regulate the impacts of development, the extensive control over the guest houses set forth in the Resort's rental agreement is more than sufficient to trigger Act 250 jurisdiction. In fact, the Resort exerts near total control over the guest houses that are rented pursuant to the rental agreement.

¶ 65. Under various sections of the agreement, the Resort, as the owners' agent during the term of the agreement: (1) "shall have management rights and authority" over the guest houses; (2) shall "act exclusively to provide the rental, cleaning, and management services"; (3) shall have "all necessary powers, easements and rights of ingress and egress and act on [the owner's] behalf in order to provide the rental management services"; (4) "shall handle all communications and negotiations with tenants with respect to renting the Property"; (5) "shall employ, supervise, discharge, and pay all employees or independent contractors who are reasonably required in the proper management and operation of the property"; (6) "shall provide maid service, linen service, and starter set of household supplies" for standard cleaning services; (7) shall be responsible for "snow plowing, snow removal, firewood, lawn maintenance and gardening"; and (8) may make any repairs estimated to be under $500 without owner approval and shall "make any repairs

30

necessary when damage to the Property is imminent and notice to Owner cannot be made within a reasonable amount of time."

¶ 66.    The agreement also requires the owner of a guest house: (1) to "furnish, equip and maintain the said premises in a rentable, suitable condition to accommodate the stated maximum number of occupants," including furnishing a wide range of specified appliances, electronics, and maintenance equipment, among other things; and (2) to notify the Resort through the standard reservation process "of any intent or request to occupy [the] Property."

¶ 67.    In sum, the rental agreement gives the Resort exclusive rights to control the rental, repair, cleaning, and management of each guest house; mandates the types of furnishings, appliances, and equipment that must be placed in each guest house; and prohibits the owner from entering the guest house without the Resort's permission.  This level of control is far beyond the " 'exercise [of] restraining or directing influence' " found necessary in our case law to trigger Act 250 jurisdiction.  See In re Ochs, 2006 VT 122, ¶ 14, 181 Vt. 541, 915 A.2d 780 (mem.) (quoting Eastland, 151 Vt. at 499-500, 562 A.2d at 1044-45).

¶ 68.    In Ochs, this Court determined that orchard owners had met their burden of showing that they sufficiently controlled agricultural land they leased from farmers on a yearly basis to fall within Act 250's agricultural exemption. 2006 VT 122, ¶ 14.  In so holding, we relied on the fact that the Ochses or their employees made "the day-to-day decisions concerning the apple cultivation at the leased orchards," did "all of the work on the lands and trees at the leased orchards" with "their own machinery," and did all the pruning, spraying, and picking of the apples during the lease period.  Id.

¶ 69.    In finding insufficient control here, the majority relies almost exclusively on comparing the situation in Ochs to the instant situation.  For the reasons stated below, I disagree with this assessment.  In any event, we did not purport to deem the circumstances in Ochs as the

minimum amount of control necessary to satisfy the control required to trigger Act 250. Indeed, as noted, we cited the same broad definition of control that we relied on in <u>Eastland</u> and <u>Vitale</u>.

¶ 70. In my view, the control over day-to-day decisions and work on the property granted to the Resort in the rental agreement gives the Resort comparable, if not greater, control than that granted to the Ochses over the leased agricultural lands. The Ochses, unlike the Resort here, did not have exclusive rights to control the rental, repair, cleaning, and management of the property they leased, including the granting of easements. Nor could they bar the owner from entering the leased lands. I do not find significant in terms of determining control, as the majority does, that the Ochses used their own equipment while the Resort compels the guest house owners to have certain types of furnishings and equipment.

¶ 71. In light of the near-complete control the agreement grants to the Resort, the majority ultimately finds insufficient control because, in the majority's view, the duration of the control here is "significantly limited" compared to the annual lease in <u>Ochs</u>. <u>Ante</u>, ¶ 49. The record does not support this reasoning. Based on information supplied to him by the Resort's attorney, the district coordinator found that "most [guest house] owners have remained affiliated with the resort [under the rental agreement] for significant periods of time—maybe for 10 or more years." The majority cites statistics indicating that 223 was the most number of nights that any single guest house was rented to guests under the agreement in a single year between 2014 and 2016. <u>Ante</u>, ¶ 49. That is similar to the average occupancy rate for commercial hotels in the United States. See Statista, Average Daily Rate of Hotels in the U.S. from 2001 to 2019, https://www.statista.com/statistics/195704/average-hotel-room-rate-in-the-us-since-2005/ [https://perma.cc/HR2T-M2FW] (reporting that between 2009 and 2018, hotel occupancy rose from 54.6 percent to 66.2 percent).

¶ 72. The majority also relies on the fact that the guest home owners can terminate the rental agreement with thirty-days' notice and are free to occupy their homes for unlimited periods,

as evidenced by Resort statistics indicating that in 2015 at least one guest house was occupied by its owner for up to 145 nights. As to the first point, unless termination is properly made, the agreement "shall continue indefinitely from the date of th[e] Agreement." As noted, many of the guest house owners have kept the rental agreement in place for ten years or more. Further, termination of the agreement does not impact the reservations that have already been made—the Resort may still fulfill those reservations.

¶ 73. As to the second point, I am not impressed by the fact that the maximum number of nights for any owner in a guest house for a single year between 2014 and 2016 was 145 nights—well under half the nights in a year. See In re Gallagher, 150 Vt. 50, 52-53, 549 A.2d 637, 639 (1988) (stating that Environmental Board's heavy reliance on fact that cabins would "continue to be occupied on seasonal basis" under proposed condominium conversion did not preclude Board from needing to determine whether conversion constituted substantial or material change under Act 250). These guest houses are for the most part second homes in which the owners spend a limited amount of time during the year. In short, the guest houses are primarily rental units that are, in effect, a component of the Resort's lodging options. As the district coordinator stated, Resort guests staying in the guest houses "are indistinguishable in terms of impacts from guests staying in a room at the Inn."

¶ 74. As noted above, to determine legislative intent, we discern the meaning of a statutory word or phrase in the context of the statute's purpose. The narrow construction of the word "control" in this case resulting from the majority's decision undermines the purpose of Act 250 to review and control environmental impacts resulting from development exceeding the jurisdictional threshold. The Resort guests occupying the guest houses pursuant to the Resort's rental agreement, like any guest staying at a room in the Inn, have paid for full access to all the Resort amenities. Thus, through automatically renewed contracts giving it exclusive control of private guest houses that were constructed on lands originally subdivided out of the Mountain Top

33

Resort tract, the Resort has dramatically increased the number of skiers, shooters, swimmers, horseback riders, wedding guests and diners—along with all the concomitant environmental impacts from that increased usage. Allowing the Resort to increase its usage in this manner without Act 250 review defeats the purpose of the Act to examine potential environmental impacts under the Act's criteria to determine if the development satisfies the law or if conditions are needed to mitigate those impacts resulting from the development.

¶ 75. The Resort points out that some of the guest houses are already subject to an Act 250 permit. But those permits were granted for single-family residences, typically seasonal/vacation residences, on a case-by-case basis rather than as part of the Resort's larger development. None of the guest houses are subject to an Act 250 permit that assesses their current use by the Resort as a significant component of its lodging accommodations. As the district coordinator found, none of these guest houses were "approved as adjunct lodging for Mountain Top resort guests." Thus, the environmental impact of that additional usage—concerning traffic, noise, wastewater, stormwater, for example—is not accurately gauged in its true context.[12] Cf. In re Toor, 2012 VT 63, ¶¶ 18-19, 192 Vt. 259, 59 A.3d 722 (holding that homeowners in areas zoned for single-family residences did not need to obtain zoning permit to rent out their home to tenants on short-term basis because they rented "to tenants who use it for the same purpose as" they do). As the result of the increased use by guest house renters, Resort operations are expanded, thereby increasing the environmental impacts that Act 250 seeks to control.

¶ 76. It is critical to understand that the issue before us arises with respect to facilities that have a history of environmental challenges, as noted by the district coordinator. First and

---

[12] Appellant asks this Court, in the event we found in her favor on the issue of control, to grant her summary judgment because the undisputed facts demonstrate that the guest houses are on "involved land" and that their use constitutes a "substantial" or "material" change—issues that the Environmental Division did not reach because of its ruling on control. I have serious doubts about whether the Resort could prevail on these issues, given the record before it, but I would remand the matter for the Environmental Division to consider them in the first instance.

foremost, the Resort has added twenty-six units to an existing thirty-six units (thirty-two rooms and four luxury cottages), a 72% increase. The rental program units are houses, not just rooms, so it is fair to infer that the number of people occupying these units is greater than those in an equivalent number of rooms in the Inn. As noted, the rental program has been going on for many years with many of the guest houses remaining in the program for ten years or more, and there was no disclosure of the program for permit consideration. The Resort offers many amenities to its guests, including those in the guest houses—a fitness center, a hot tub, a sauna, hiking trails, an outdoor heated swimming pool, a private beach, disc golf, kayaking, canoes, stand-up paddle boards, tennis courts, a sand volleyball court, lawn games, cross-country and snowshoe trails, sleds and a sledding hill, and an ice skating rink. The Resort also has a restaurant and a special wedding venue.

¶ 77. It is not surprising that all these activities and facilities have raised environmental concerns. The district coordinator noted that parties to another Act 250 case pending with respect to the Resort had raised compliance issues, "among them that the resort activities had, in recent years, exceeded permitted levels of traffic and aesthetic impacts associated with large weddings and other events." He also noted that "in the summer of 2015, the 9000 gallon-per-day primary septic system serving the lodge and Wedding Barn was found to be in a state of failure," and "the primary septic field suffered a complete failure in 2016 and had to be replaced" making it, at minimum, "the fourth such failure in the history of the resort."

¶ 78. For the reasons stated above, I dissent from the majority's decision to affirm the Environmental Division's decision that Mountain Top Resort does not exercise control over the guest houses in the rental program. Holding that the rental units are part of the accommodations controlled by the Resort is the only way to regulate the overall impact of Resort facilities under the Act 250 criteria. I would reverse the Environmental Division's decision regarding control over

35

the guest homes and remand the matter for the court to require that the guest homes be included in the Resort's permit amendment.

¶ 79.    I am authorized to state that Judge Wesley (Ret.) joins this concurrence and dissent.

_____
Associate Justice (Ret.), Specially Assigned